**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| United States ex rel.<br>PAUL FABULA<br>Bringing this action on behalf of himself, and<br>THE UNITED STATES OF AMERICA<br>Plaintiffs,<br><br>v.<br><br>AMERICAN MEDICAL RESPONSE, INC.,<br>Defendant. | No. 3:12-cv-921 (MPS) |
|---|---|

**MEMORANDUM AND ORDER**

Plaintiff-Relator Paul Fabula ("Mr. Fabula") brings this action against Defendant American Medical Response, Inc. ("AMR"). Count One of Mr. Fabula's Second Amended Complaint (the "SAC") alleges that AMR violated the False Claims Act ("FCA") 31 U.S.C. § 3729 *et seq*. by making false statements and submitting false claims to Medicare and Medicaid. (SAC [Dkt. # 39] ¶ 1.) Count Two alleges that AMR violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h). AMR has moved to dismiss the SAC on the grounds that: (1) Mr. Fabula lacks standing to pursue his FCA claims because they belong to his bankruptcy estate, (2) Mr. Fabula fails to plead his allegations of false claims under the FCA with particularity as required by Fed. R. Civ. P. 9(b), and (3) Mr. Fabula's FCA retaliation claim fails to state a claim on which relief can be granted. For the reasons that follow, AMR's motion to dismiss is GRANTED.

## I. BACKGROUND

On June 22, 2012, Mr. Fabula, a resident of Connecticut, filed this *qui tam* action under seal [Dkt. # 1] as a relator on behalf of the United States. On September 27, 2013, the United

States gave notice that it was declining to intervene. (Government's Notice of Election to Decline Intervention by USA [Dkt. # 18].) The United States amended its notice on November 1, 2013 [Dkt. # 22], and the Court ordered the Complaint unsealed on November 7, 2013. (Order [Dkt. # 24].)

According to the SAC, "AMR is the nation's leading medical transportation company," and it performs ambulance transport services in over 2,100 communities in 38 states and the District of Columbia. (SAC [Dkt. # 39] ¶ 10.) Mr. Fabula began his employment at AMR as an Emergency Medical Technician ("EMT") in New Haven, Connecticut, in August 2010. Mr. Fabula's job as an EMT involved performing emergency and non-emergency medical transport services in New Haven, Fairfield County, Greater Hartford/Northeast Connecticut, and Waterbury/Farmington Valley. (*Id.* ¶¶ 5-7.)

**A. Count One**

Mr. Fabula's first count alleges that AMR (1) "knowingly presented or caused false records or statements to be presented to the United States for the purpose of getting a false or fraudulent claim paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)," and (2) "knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims to the United States for the purpose of getting false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(2)." (*Id*. ¶¶ 125-126.) Specifically, Mr. Fabula alleges that "AMR knowingly, systematically, and/or with willful disregard[,] submitted claims for payment for ambulance transports in New Haven, Hartford, Waterbury[,] Bridgeport, Texas, Arizona, California, New York, and at every AMR facility all across the United States that failed to meet Medicare and Medicaid coverage criteria with regard to medical necessity . . . ." (*Id*. ¶ 127.)

In order to receive reimbursement from Medicare for its ambulance transports, AMR "was required to review and submit information about the condition of patient[s] and the emergency or non-emergency medical services provided." (*Id.* ¶ 19.) Medicare does not reimburse ambulance trips that are not "medically necessary," which requires that "use of other means of transportation would endanger the patient's health, whether or not such other transportation is actually available." (*Id.* ¶ 41 *citing* Medicare Manual §2120.2(A).) Each time AMR dispatched an ambulance to transport someone, the team of paramedics and EMTs who participated in the ambulance run were required to complete an electronic Patient Care Report ("PCR"). (*Id.* ¶ 55.) AMR submitted these PCRs to the Centers for Medicare & Medicaid Services to obtain reimbursement for its services.

Mr. Fabula's SAC alleges that "AMR submitted bills that falsely indicated the transportation met the medical necessity requirement, as that term is used in 42 C.F.R. § 410.40(d) and (e), when in fact the requirement was not met."[1] (*Id.* ¶ 44.) AMR's "fraudulent[] submissions included claims for services that were not provided and for amounts that AMR was not entitled to receive." (*Id.* ¶ 45.) Mr. Fabula alleges that "[a]ll ambulance personnel at AMR were directed to falsify PCRs by including information that would qualify for Medicare reimbursement [for] runs that did not meet the medical necessity requirement." (*Id.* ¶ 60.)

Before he began his employment at AMR, Mr. Fabula served as a medic in the United States Army from February 2005 until 2010. (*Id.* ¶ 8.) While he was in the army, Mr. Fabula was

[1] 42 C.F.R. § 410.40(d)(1) provides, in relevant part, that "Medicare covers ambulance services . . . only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated. . . ."

42 C.F.R. § 410.40(e)(3) provides, in relevant part, that "Medicare covers . . . ambulance transportation . . . [f]rom a [skilled nursing facility ("SNF")] to the nearest supplier of medically necessary services not available at the SNF where the beneficiary is a resident, including the return trip."

stationed in Texas, Arizona, California, and New York, and he volunteered to serve on ambulance runs with AMR facilities in those states. (*Id.*) Mr. Fabula alleges that he "witnessed superiors at every one of these facilities directing AMR ambulance personnel to alter the forms submitted for Medicare and Medicaid reimbursement for the transportation of patients." (*Id.*) Thus, the SAC states that Mr. "Fabula's knowledge of AMR['s] violations of the False Claims Act began when [he] was serving in the U.S. Army" and volunteering with AMR. (*Id.* ¶ 129.)

**B. Count Two**

Mr. Fabula brings a second count for retaliation in violation of 31 U.S.C. § 3730(h). Mr. Fabula stopped working for AMR and went on medical leave after December 25, 2011, due to "a debilitating shoulder injury." (*Id.* ¶ 69.) In February 2012, while he was still on medical leave, his supervisor, Russell Pierson ("Mr. Pierson"), allegedly contacted Mr. Fabula by e-mail and asked him to return to work in order to recreate a PCR for an ambulance run that had occurred in December 2011, and for which the PCR allegedly had been lost. (*Id.* ¶ 70.) Mr. Fabula e-mailed Mr. Pierson back and said that he was not "comfortable" with the request and did not recall the information he was being asked to document. (*Id.* ¶ 71.) Mr. Pierson did not respond. (*Id.* ¶ 72.) Later that month, Mr. Pierson called Mr. Fabula and "directed him to return" to AMR's facility in New Haven. "When [Mr.] Fabula arrived, [Mr.] Pierson showed him some papers and said: 'You should be able to complete the PCR with the information I've provided.'" (*Id.*) Mr. Fabula alleges that "[t]he supervisor on duty, John McFarland . . . handed [Mr.] Fabula a printed PCR form that had been filled out by" another AMR employee for an ambulance run that had occurred in December 2011, as well as about two paragraphs of handwritten information that Mr. Pierson directed Mr. Fabula to include in a new electronic PCR for that ambulance run. (*Id.* ¶¶ 74-75.) Mr. Pierson allegedly told Mr. Fabula that if he did not include the handwritten information in

the new PCR, he could not come back to work. (*Id*. ¶ 75.) Mr. Fabula refused, and "was told he could not return to work until he completed the document" and "that his refusal was a direct violation of the company's standard operating procedure." (*Id*. ¶¶ 77-78.) Mr. Fabula did not return to work. Mr. Pierson wrote a letter to Mr. Fabula, dated March 1, 2012, instructing him to "contact this office immediately to arrange a time for reconciliation and transmission of this EPCR (Electronic PCR). Failure to do so will result in corrective action up to and including termination." (*Id*. ¶ 79.) Mr. Fabula did not follow these instructions, and as of the time he filed the SAC, on March 5, 2014, "he has not been called back to work and in effect has been terminated." (*Id*. ¶ 80.) Additional pertinent facts are set forth below in the discussion of the parties' arguments.

## II. <u>DISCUSSION</u>

### A. Rule 12(b)(1) Motion to Dismiss Count One -- Subject Matter Jurisdiction

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citations and quotation marks omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (internal citations and quotation marks omitted). The district "court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (internal citations omitted). The "court may consider evidence outside the pleadings" in resolving a Rule 12(b)(1) motion to dismiss. *Id.*

AMR argues that, as a result of Mr. Fabula's filing for bankruptcy on February 16, 2011, the claim set forth in Count One belongs to the bankruptcy estate, not to Mr. Fabula, and therefore Mr. Fabula lacks standing. "Whether a cause of action belongs to a bankruptcy estate is a question of law . . . ." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008). The Bankruptcy Code provides that the commencement of a voluntary bankruptcy case creates a broadly-defined estate that, subject to certain exceptions not applicable here, includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *Chartschlaa*, 538 F.3d at 122 (*quoting In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993)) (internal quotation marks omitted). Generally, "the bankruptcy estate includes all causes of action that the debtor could have brought at the time of the bankruptcy petition." *U.S. ex rel. Gebert v. Transp. Admin. Servs.*, 260 F.3d 909, 913 (8th Cir. 2001). A bankruptcy estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). The bankruptcy "estate includes only post-petition claims acquired by the *estate*, not post-petition claims acquired by the *debtor*."[2] *Neely v. RMS Residential Mortgage Solution, L.L.C.*, No. 12-CV-1523 JS AKT, 2013 WL 752636, at *8 (E.D.N.Y. Feb. 26, 2013) (emphasis added). Post-petition claims belong to the estate only if they are "'sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered

[2] "[A]fter the filing of the bankruptcy petition, property of the estate is distinct from the property of the debtor. Property acquired by the estate after the commencement of the case becomes property of the estate. In contrast, property acquired by the debtor after the commencement of the case does not enter the estate." *Rivera v. Ndola Pharmacy Corp.*, 497 F. Supp. 2d 381, 396 (E.D.N.Y. 2007) (internal quotation marks and citations omitted).

fresh start.'" *Id.* (*quoting Segal v. Rochelle,* 382 U.S. 375, 380 (1966)). Such property "will vest in the estate if it is derived from property that was part of the estate as of the commencement of the bankruptcy." *Chartschlaa,* 538 F.3d at 122.

AMR requests that this Court take judicial notice of Mr. Fabula's voluntary petition for bankruptcy under Chapter 7 of Title 11 of the United States Code, filed on February 16, 2011. (Def.'s Request for Judicial Notice Ex. A [Dkt. # 41].) Because the filings in Mr. Fabula's bankruptcy case are matters of public record, the court takes judicial notice of them without converting this motion to dismiss into one for summary judgment. *See Bentley v. Dennison,* 852 F.Supp.2d 379, 382 n. 5 (S.D.N.Y.2012) ("Judicial notice of public records is appropriate—and does not convert a motion to dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned."); *Peart v. Latham & Watkins LLP*, 985 F. Supp. 2d 72, 81 (D.D.C. 2013) ("In deciding a motion to dismiss pursuant to FRCP 12(b)(1) and (b)(6), a court may take judicial notice of public records from other proceedings, so long as the matters to be noticed are relevant.") (internal citations omitted).

Schedule B (Question 21) of his bankruptcy petition required Mr. Fabula to list "other contingent and unliquidated claims of every nature" and give an estimated value of each. (Def's Request for Judicial Notice Ex. A [Dkt. # 41] at 10.) At the time he filed for bankruptcy, Mr. Fabula indicated that he had no such "contingent and unliquidated claims," and his petition did not otherwise mention the claims associated with this lawsuit. (*Id.*) After the bankruptcy trustee, Ronald I. Chorches ("Mr. Chorches"), certified to the bankruptcy court that Mr. Fabula's estate was "fully administered," the bankruptcy court issued an order discharging Mr. Fabula on May

11, 2011, and closed the bankruptcy case on June 1, 2011. (Pl.'s Report on Developments in Bankruptcy Case [Dkt. # 64-1] at 3-4.)

AMR contends that Mr. Fabula was aware of the alleged FCA violations as early as 2005, when he began volunteering at AMR in various states outside of Connecticut. (SAC [Dkt. # 39] ¶¶ 129-130.) AMR argues that Mr. Fabula "possessed all information necessary to assert his claims" at the time he filed for bankruptcy in February 2011, and thus that his FCA claims belong to his bankruptcy estate. (Def.'s Mem. Motion to Dismiss [Dkt. # 40] at 10-11.) A plaintiff's "standing is to be determined as of the commencement of suit." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570 n.5 (1992). If Mr. Fabula's FCA claims belonged to his bankruptcy estate, then he lacked standing to pursue them when he brought this *qui tam* action, whether or not he previously listed such claims as assets of his bankruptcy estate. This is because even "[u]ndisclosed, unscheduled assets . . . 'automatically remain property of the estate after the case is closed.'" *Goldson v. Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP*, No. 13CV2747-GBD-FM, 2014 WL 4061157, at *4 (S.D.N.Y. July 11, 2014) (*quoting Chartschlaa,* 538 F.3d at 122). Property owned by the bankruptcy estate that "was not scheduled by the debtor is not abandoned and remains the property of the bankruptcy estate." *Kassner v. 2nd Ave. Delicatessen Inc.*, No. 04 CV 7274 (GBD), 2005 WL 1018187, at *3 (S.D.N.Y. Apr. 29, 2005).

> When a cause of action belongs to the bankruptcy estate, typically that claim can only be brought by the trustee, unless the trustee has abandoned the claim. A trustee may abandon the estate's *scheduled* property either after notice and a hearing, or by failing to administer the claim before the close of the bankruptcy case. *Unscheduled* property can never be abandoned without the trustee's satisfaction of the notice and hearing requirements.

*Channer v. Loan Care Serv. Ctr., Inc.*, No. 3:11CV135 SRU, 2011 WL 5238878, at *3 (D. Conn. Nov. 1, 2011) (internal citations omitted). "In light of the impact of abandonment on the rights of creditors, a trustee's intent to abandon an asset must be clear and unequivocal." *Chartschlaa,* 538

F.3d at 123. There is no clear and unequivocal evidence of the trustee's intent to abandon Mr. Fabula's FCA claims.

The SAC states that while Mr. Fabula was volunteering at various AMR locations across the country, he witnessed AMR employees altering forms submitted for Medicare and Medicaid reimbursement. (SAC [Dkt. # 39] ¶ 8.) The SAC also suggests, however, that Mr. Fabula did not understand until some time *after* he began working for AMR in New Haven in August 2010 that those other AMR offices were submitting false claims. (*Id*. ¶ 8 "After working for AMR in New Haven, Mr. Fabula came to understand, as he personally witnessed in the Connecticut offices, that in these other offices[,] AMR was submitting false information to obtain undeserved payments under Medicare and Medicaid rules and regulations.")[3] The SAC does not specify the exact date Mr. Fabula "came to understand" that AMR was allegedly submitting false claims to the U.S. government, nor does it specify whether that date was prior to the closing of his bankruptcy case on June 1, 2011.

Recent events, however, suggest that both Mr. Fabula and the trustee of his bankruptcy estate view the *qui tam* claims as property of the bankruptcy estate. On May 16, 2014, Mr. Fabula moved to reopen his bankruptcy case. (Motion to Reopen Case *Pursuant to 11 USC 350(b)* [Case No. 11-50256-AHWS Dkt. # 13].)[4] Mr. Fabula's motion stated that he sought "to

[3] Another paragraph of the SAC, however, states that "Fabula's knowledge of AMR['s] violations of the False Claims Act began when Fabula was serving in the U.S. Army in the period before he began his employment with AMR in New Haven, and continued right up to the present date all across the country . . . ." (*Id*. ¶ 129.)

[4] "[A] bankruptcy case that has been fully administered and closed 'may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.'" *In re Arana*, 456 B.R. 161, 171 (Bankr. E.D.N.Y. 2011) (*quoting* 11 U.S.C. § 350(b)). "Cause to reopen a bankruptcy case includes 'to administer an undisclosed lawsuit.'" *In re Easley-Brooks*, 487 B.R. 400, 407 (Bankr. S.D.N.Y. 2013) (*quoting In re Upshur,* 317 B.R. 446, 451 (Bankr. N.D. Ga. 2004)).

reopen his Chapter 7 case in order to amend Schedule B to list his" *qui tam* claims against AMR and "amend Schedule D to exempt an amount of said claims." (*Id.*) The bankruptcy court held a hearing on this motion, and granted it on June 27, 2014. (Order Granting 16 Amended Motion to Reopen Case [Case No. 11-50256-AHWS Dkt. # 25].) On August 22, 2014, Mr. Fabula amended asset Schedule B to include his *qui tam* claims, listing as personal property, "[t]he claims set forth in the action styled Paul Fabula v. American Medical Response, Inc., pending in US District Court District of Connecticut . . . to the extent that they are property of the estate."[5] (Def.'s Response to Pl.'s Status Report, Ex. B [Dkt. # 65-2] at 3-6.) The bankruptcy case was re-closed on September 18, 2014. (Pl.'s Report on Developments in Bankruptcy Case [Dkt. # 64-1] at 6.) On November 18, 2014, Mr. Chorches moved to reopen the case to administer "valuable assets." (Trustee's Motion to Reopen Case [Case No. 11-50256-AHWS Dkt. # 30] at 1.) The bankruptcy court granted the motion on November 20, 2014, and the case has remained open since that date. (Pl.'s Report on Developments in Bankruptcy Case [Dkt. # 64-1] at 6-7.) Finally, on January 23, 2015, the bankruptcy court found it to be necessary and "in the best interests of the estate" to authorize Mr. Chorches to employ Mr. Fabula's counsel—Zelle, McDonough & Cohen, LLP—to litigate the *qui tam* action on behalf of the bankruptcy estate. (Pl.'s Report on Developments of Bankruptcy Case [Dkt. # 66-1] at 1.)

[5] Also on August 22, 2014, Mr. Fabula added his FCA claims in the same manner under Schedule C, which lists property the debtor claims as exempt. (Def.'s Response to Pl.'s Status Report, Ex. B [Dkt. # 65-2] at 6.) In Schedule C, Mr. Fabula listed the value of the claimed exemptions as $5,375.00, and specified 11 U.S.C. § 522(6) as the law providing for the exemption. 11 U.S.C. § 522(6) states that "the debtor's aggregate interest, not to exceed $2,300 in value, in any implements, professional books, or tools[] of the trade of the debtor or the trade of a dependent of the debtor" may be exempt from the bankruptcy estate. Mr. Fabula's *qui tam* claims are not implements, books, or tools of Mr. Fabula's occupation as an EMT, and therefore they do not fit this definition and would not be exempt for this reason.

All this makes clear that the Court need not resolve the question whether Mr. Fabula possessed the cause of action set forth in Count One when he filed for bankruptcy. Whether or not he at one time had an interest in pursuing that cause of action, the recent activity in the bankruptcy court makes clear that he does not have such an interest now. "Thus, to the extent that the plaintiff[] had standing at the time of the filing, given the subsequent actions discussed above, once the [plaintiff] lost tangible interest, [his] claims were rendered moot."*Azim v. Vance*, 530 F. App'x 44, 46 (2d Cir. 2013) (summary order). "Under Article III's standing requirement, 'if the plaintiff loses standing at any time during the pendency of the proceedings in the district court or in the appellate courts, the matter becomes moot, and the court loses jurisdiction.'" *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 375 B.R. 719, 724 (S.D.N.Y. 2007) (*quoting Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir.2001)). Because it is clear that Mr. Fabula has lost any personal interest he might have had in pursuing Count One, and thus that the Court has lost jurisdiction over that claim, the Court does not reach AMR's second argument, that Mr. Fabula failed to plead his allegations of false claims under the FCA with particularity as required by Fed. R. Civ. P. 9(b).

"Instead of dismissing the debtor's case, it is generally preferable to permit the bankruptcy trustee to be substituted, as the named plaintiff, in place of the debtor." *Kassner*, 2005 WL 1018187, at *4. "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997). Fed. R. Civ. P. 17(a)(3) provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted

into the action. . . .” Mr. Fabula’s bankruptcy case has remained open since November 20, 2014. (Pl.’s Report on Developments in Bankruptcy Case [Dkt. # 64] at 6-7.) Over a month ago, on January 23, 2015, the bankruptcy court authorized Mr. Chorches to employ Mr. Fabula’s counsel—Zelle, McDonough & Cohen, LLP—to litigate the *qui tam* action on behalf of the bankruptcy estate. (Pl.’s Report on Developments of Bankruptcy Case [Dkt. # 66-1] at 1.) Thus, Mr. Fabula has had “a reasonable time” to substitute the trustee into this action. Therefore, the Court GRANTS AMR’s motion to dismiss Count One without prejudice. This order, dismissing Count One, is stayed for thirty (30) days to allow the bankruptcy trustee to appear and prosecute Mr. Fabula’s claims, if he wishes to do so, either by motion to substitute filed by Mr. Fabula under Rule 17 or a motion by the trustee to join as a plaintiff under Rule 20(a)(1).

**B. Rule 12(b)(6) Motion to Dismiss Count Two for Failure to State A Claim**

When he moved to reopen his bankruptcy case, Mr. Fabula specifically asserted that “[t]he claims alleged by the second count are not property of the bankruptcy estate, because they relate to events that arose subsequent to the Petition Date.” (Motion to Reopen Case *Pursuant to 11 USC 350(b)* [Case No. 11-50256-AHWS Dkt. # 13].) AMR concedes that Mr. Fabula had standing to pursue his retaliation claims “because these claims did not arise until after the Petition Date and constitute his property (not property of his bankruptcy estate).” (Def.’s Mem. Motion to Dismiss [Dkt. # 40] at 10 n.10.) Finally, Mr. Fabula’s retaliation claims accrued in March 2012, well after his discharge from bankruptcy in May of 2011, and the closure of his bankruptcy case in June 2011.

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the plaintiff has alleged “enough facts to state a claim to relief that is plausible on its face.” *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570. Under *Twombly*, the Court accepts as true all of the complaint’s

factual allegations when evaluating a motion to dismiss. *Id*. at 572. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). For a complaint to survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010).

Mr. Fabula alleges that AMR terminated him in retaliation for his refusal to falsify information on a PCR as instructed by his supervisor, Mr. Pierson. (SAC [Dkt. # 39] ¶ 135.) AMR argues that Mr. Fabula fails to state a claim on which relief can be granted because he fails to allege that he was engaged in protected conduct, and he does not allege that his employer knew he was engaged in such conduct. (Def.'s Mem. Motion to Dismiss [Dkt. # 40] at 30-31.) AMR characterizes Mr. Fabula's conduct as "just a refusal to complete a form," and argues that Mr. Fabula was not engaged in an investigation and therefore his conduct was not protected. (Def.'s Mem. Motion to Dismiss [Dkt. # 40] at 30-31.)

The FCA's retaliation provision, 31 U.S.C. § 3730(h)(1), provides[6]:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in

[6] As enacted in 1986, Section 3730(h) originally provided that:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. . .

> furtherance of an action under this section or other efforts to stop 1 [one] or more violations of this subchapter.

To state a claim under this provision, Mr. Fabula must plead facts showing: "(1) that he engaged in conduct protected under the statute, (2) that defendants were aware of his conduct, and (3) that he was terminated in retaliation for his conduct." *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 256 (N.D.N.Y. 2013). The statutory language quoted above makes clear that the adverse action triggering the entitlement to "relief" must be taken "because of" certain protected conduct. The nature of the protected conduct is slightly ambiguous due to the imprecise phrasing of the dependent clause, i.e., "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." This clause may mean "lawful acts done by the employee . . . in furtherance of" *either* "an action under this section" *or* "other efforts to stop 1 or more violations of this subchapter." Alternatively, the clause may mean *either* "lawful acts done by the employee . . . in furtherance of an action under this section" *or* "other efforts to stop 1 or more violations of this subchapter." At least one court seems to have adopted the latter interpretation. *See United States ex rel. Tran v. Computer Sciences Corp.*, No. 11-CV-0852 (KBJ), 2014 WL 2989948, at *22 (D.D.C. July 3, 2014) ("The amended FCA states unequivocally that a relator is protected from retaliation only insofar as he has been retaliated against for engaging in *two categories of conduct* : (1) "lawful acts done . . . in furtherance of an action under this section[,]" or (2) "other efforts to stop 1 or more violations of this subchapter[.]"). And at least one court has adopted the former interpretation. *See Townsend v. Bayer Corp.*, 774 F.3d 446, 458 (8th Cir. 2014). I view the former interpretation as more persuasive because the latter would embrace not only "lawful acts" but also, presumably, unlawful acts that comprised part of an "other effort[]." The latter view would also embrace not only "acts done by the employee" but also acts done by anyone else as

part of such an effort, i.e., the "other efforts" would not have to be performed by the employee (or the contractor, agent, or associated others) at all. Neither of these extensions would be in keeping with Congress's purpose of fostering law enforcement and protecting those who assist in the discovery and prosecution of fraud from retaliation for their own acts. *See U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) ("Section 3730(h), added in 1986, was designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime.") (internal citations and quotation marks omitted).

Applying the former interpretation to this case yields the following formulation by which to test Mr. Fabula's allegations: He must allege facts showing that AMR took adverse action against him because he performed (1) a "lawful act" that was (2) "in furtherance of" (3) either (a) "an action under this section" or (b) "other efforts to stop 1 or more violations of this subchapter." Mr. Fabula's allegation that he refused to fill out a PCR with details of an ambulance trip that he could not remember, and that were supplied to him by someone else, probably clears the first of these hurdles—a "lawful act"—but it does not clear any of the others. While one could argue that by a "lawful act," Congress meant something more than a refusal to participate in activity that the employee regards as wrong—what might be termed a "refusal to act"—, I will assume without deciding that Mr. Fabula's allegation that he defied his boss's command to fill out the form constitutes a "lawful act." There are, however, no facts alleged suggesting that Mr. Fabula's refusal to complete the form was "in furtherance" of anything other than Mr. Fabula's own sense of what was right or what he was "comfortable" with. (SAC [Dkt. # 39] ¶ 71.) Thus, Mr. Fabula's refusal to participate was not "in furtherance of an action" under the FCA. Mr. Fabula does not allege that his refusal to fill out the form was accompanied by a

protest or complaint to his employer, the Government, or anyone else that doing so would violate the FCA or any other law. Nor is there an allegation suggesting that Mr. Fabula's refusal to complete the PCR was a first step in his own fraud investigation.

Mr. Fabula's allegation that he refused to participate in what he regarded as improper conduct is also devoid of any suggestion that it was "in furtherance of . . . other efforts to stop 1 or more violations" of the FCA—be they complaints to his employer's management or in-house counsel, reports to the media, or a reasoned explanation to his supervisors that what they were asking him to do violated the law and should cease. Any of these activities might be regarded as an "effort" to "stop," i.e., "to hinder or prevent the passage of," "to get in the way of," "to keep from carrying out a proposed action," or "to cause to cease," *Webster's Third New International Dictionary of the English Language, Unabridged* 2250 (2002), "[one] or more violations" of the FCA, but there is no allegation suggesting that Mr. Fabula's declining to fill out the form was part of any such larger "efforts." Instead, Mr. Fabula alleges only that he told his employer that he refused to redo the PCR because he did not feel "comfortable" with the request and did not recall the information from the run several months earlier. (SAC [Dkt. # 39] ¶ 71.) This falls short of an "effort[] to stop" a FCA violation. Even assuming that Mr. Fabula's supervisors were bent on pressing an ambulance EMT to fill out a PCR with false information, there is no reason to think that Mr. Fabula's mere refusal to participate was calculated to "stop" or would have stopped the violation at all. If Mr. Fabula did not remember and would not make up what happened, the supervisors would simply find another EMT who would—or so the SAC suggests. Indeed, in February 2012, when Mr. Fabula refused to complete a new PCR, he was allegedly asked by his supervisors to redo a PCR another AMR employee had previously completed.

> The supervisor on duty, John McFarland, at the direction Pierson, handed Fabula a printed PCR form that had been filled out by Kevin Bodiford for a run in

> December 2011, and a cover sheet that included handwritten information that Pierson directed Fabula to include, with the information from the printed PCR, onto a new PCR on the computer and to certify the new to be submitted for Medicare reimbursement.

(SAC [Dkt. # 39] ¶ 74.) Mr. Fabula alleges that "[a]ll ambulance personnel at AMR were directed to falsify PCRs by including information that would qualify for Medicare reimbursement [for] runs that did not meet the medical necessity requirement." (SAC [Dkt. # 39] ¶ 60; *see also* SAC ¶ 55: "Each time an ambulance was dispatched by AMR . . . *the ambulance team consisting of paramedics and EMTs* was required to prepare a [PCR]." (emphasis added).) Further, because there is no allegation that Mr. Fabula told his employer that what it was doing was illegal, there is no reason to think his "lawful act" was designed to prompt an examination of—let alone a change to—AMR's practices. Thus, Mr. Fabula's mere refusal to complete the PCR, without other affirmative acts to stop the alleged fraud, is not protected activity.

This textual analysis of the statute governing the retaliation claim is consistent with recent cases from other courts. *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262-63 (5th Cir. 2013) (affirming summary judgment on FCA retaliation claim where plaintiff merely told supervisors that what they were asking of her "wasn't ethical" and plaintiff "did not submit evidence establishing that she sought to pursue a *qui tam* action, that she informed anyone at ITT that its actions were illegal, or that she informed anyone at ITT that its actions were fraudulent."); *Computer Sciences Corp.*, 2014 WL 2989948, at *22 (finding no cases "in which a court decided that the refusal to participate in allegedly fraudulent conduct, standing alone, was 'protected activity'"). Although the legislative history of the 2009 amendments to the retaliation provision suggests that Congress intended to broaden protected conduct to include refusals to

participate,[7] the actual text of the statute does not. And while the statutory clause at issue may carry the ambiguity discussed above, the words that denote the objects of the "lawful acts," i.e., "an action under this section" and "other efforts to stop 1 or more violations of this subchapter" are clear, and unambiguously exclude the type of vaguely articulated refusal to follow an employer's instruction that Mr. Fabula alleges here. *United States v. DiCristina*, 726 F.3d 92, 96-97 (2d Cir. 2013) ("*In the event that the text of a statute is not clear*, a court interpreting the statute may consult the legislative history to discern the legislative purpose as revealed by the history of the statute." (emphasis added) (internal citations and quotation marks omitted)).

As Judge Jackson explained in *Computer Sciences Corp.*, "[w]ith rare exception, the mere refusal to participate in an allegedly unlawful scheme is neither an 'act[ ] done' nor an 'effort[ ]' taken, and such forbearance certainly does not equate with the kind of affirmative activity that the text of the statute conveys." *Id*. "[E]ven when courts assessing FCA retaliation claims have mentioned with some approval a relator's refusal to participate in a fraudulent scheme, that fact is inevitably coupled with actual actions that the relator took either to promote its FCA suit, or to stop the alleged fraud." *Id.*

---

[7] Congressman Howard L. Berman's comments in support of the amendments stated:

> To address the need to widen the scope of protected activity, Section 4(d) of S. 386 provides that Section 3730(h) protects all lawful acts done . . . in furtherance of . . . other efforts to stop 1 or more violations of the False Claims Act. This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and *refusals to participate in the misconduct that leads to the false claims*, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.

155 Cong. Rec. E1295-03 (June 3, 2009) 2009 WL 1544226 (statement of Rep. Howard L. Berman) (emphasis added). It appears that Congressman Berman submitted these comments as extended remarks on June 3, 2009, over one week after the President signed the amended provision into law on May 20, 2009, as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA").

Accordingly, the Court finds that Mr. Fabula has failed to state a claim for retaliation under the FCA, and the Court grants AMR's motion to dismiss Count Two.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to dismiss Count One but stays this portion of its ruling for thirty (30) days to allow the bankruptcy trustee to appear and prosecute Mr. Fabula's claims, if he wishes to do so. The Court GRANTS AMR's motion to dismiss Mr. Fabula's Count Two with prejudice.

If the trustee is substituted for Mr. Fabula, then initial discovery will be limited to the question whether Mr. Fabula was aware of the facts and circumstances giving rise to his FCA claim at the time he filed for bankruptcy in February 2011. At the end of that initial phase of discovery, AMR may file a motion, attaching any relevant discovery material, seeking an order aimed at enforcing the doctrine of judicial estoppel based on Mr. Fabula's failure to disclose the claim in his bankruptcy and limiting the recovery of the trustee to an amount that would satisfy the creditors and the expenses of administration. The trustee will then have 21 days to oppose the motion and to rebut any suggestion that Mr. Fabula had sufficient awareness of the cause of action to disclose it when he filed for bankruptcy.

"The purpose of judicial estoppel is 'to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *In re Adelphia Recovery Trust*, 634 F.3d 678, 696 (2d Cir. 2011) (*quoting New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). It applies when: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Id.* at 695-96 (*quoting New*

*Hampshire*, 532 U.S. at 750–51). As AMR points out, judicial estoppel may apply if 1) Mr. Fabula "took an inconsistent position in failing to disclose the FCA claims in the bankruptcy case, only to reopen that case when AMR challenged his standing," 2) the bankruptcy court adopted this position when it granted discharge and closed the case, and 3) it is shown that Mr. Fabula "concealed the alleged FCA claims in a bad faith attempt to preserve the claims for himself to the detriment of his creditors." (Def.'s Response to Pl.'s Status Report [Dkt. # 65] at 4.) If the Court finds that judicial estoppel applies, the bankruptcy trustee will be allowed to "litigate the claims solely for the benefit of the estate and its creditors," and may not recover for Mr. Fabula's benefit. *Grammer v. Mercedes Benz of Manhattan*, No. 12 CIV. 6005 LTS JCF, 2014 WL 1040991, at *6 (S.D.N.Y. Mar. 13, 2014) (finding that plaintiff was estopped from recovering due to his failure to schedule claims in his Chapter 7 bankruptcy petition.).

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
March 4, 2015