# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States ex rel. RONALD I. CHORCHES, Bankruptcy Trustee, <br><br> Bringing this action on behalf of THE UNITED STATES OF AMERICA, the ESTATE OF PAUL FABULA, and PAUL FABULA, Individually <br><br>     Plaintiff-Relator <br><br>     v. <br><br> AMERICAN MEDICAL RESPONSE, INC., <br><br>     Defendant. | No. 3:12-cv-921 (MPS) |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff-Relator Ronald Chorches, trustee of the bankruptcy estate of Paul Fabula, brings this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., against Defendant American Medical Response, Inc. ("AMR"). The Third Amended Complaint (the "TAC") alleges that AMR, an ambulance company, violated the FCA by making false statements and submitting false claims to the government for reimbursement under the Medicare and Medicaid programs. (TAC, ECF No. 76.) AMR has moved to dismiss the TAC for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and for failure to plead fraud with particularity under Federal Rule of Civil Procedure 9(b).

The standard adopted by most district courts in this Circuit for pleading FCA claims requires particularity not only in alleging a fraudulent scheme, but also in alleging the actual submission of requests for payment, or "claims," to a government payor. The TAC does not meet this standard, as it pleads no factual detail regarding actual requests for payment submitted to the government. There is no specification of invoice numbers, invoice dates, or amounts billed or

reimbursed. In short, the TAC alleges no facts indicating that the medically unnecessary ambulance services it describes were actually billed to a government payor. For these reasons and others set forth below, AMR's motion to dismiss is GRANTED.

## I.    BACKGROUND

### A.    Procedural History

On June 22, 2012, Fabula filed this *qui tam* action under seal (ECF No. 1) as a relator on behalf of the United States. On September 27, 2013, the United States gave notice that it was declining to intervene. (Government's Notice of Election to Decline Intervention by USA, ECF No. 18.) The United States amended its notice on November 1, 2013 (ECF No. 22), and the Court ordered the Complaint unsealed on November 7, 2013. (Order, ECF No. 24.) Fabula filed his second amended complaint ("SAC"), bringing claims under the False Claims Act, 31 U.S.C. § 3729(a)(1) and 3729(a)(2) (Count One) on March 5, 2014. (SAC, ECF No. 39 ¶¶ 125-126.) Fabula also brought a claim for retaliation in violation of 31 U.S.C. § 3730(h) (Count Two). (*Id.* ¶¶ 131-41.)

AMR moved to dismiss the first count of the SAC for lack of subject matter jurisdiction, arguing that Fabula lacked standing to pursue his FCA claims because they belonged to his bankruptcy estate. (ECF No. 40-1 at 8-10.) AMR also argued that Fabula failed to plead his FCA claims with particularity as required by Fed. R. Civ. P. 9(b). (*Id.* at 11-24.) Finally, AMR argued that the second count, Fabula's FCA retaliation claim, failed to state a claim on which relief can be granted. (*Id.* at 30-32.) On March 4, 2015, the Court granted AMR's motion to dismiss Count One, finding that Fabula had lost any personal interest he had in pursuing the claim. The Court stayed this portion of its ruling for thirty (30) days to allow the bankruptcy trustee to appear and prosecute Fabula's claims. (ECF No. 67 at 19.) The Court also granted AMR's motion to dismiss Count Two, Fabula's retaliation claim. (*Id.*) Chorches, the trustee for Fabula's bankruptcy estate,

appeared and moved to join the case on March 23, 2015 (ECF Nos. 68-70), and the Court

granted the motion for joinder on April 2, 2015. (ECF No. 73.) On April 24, 2015, Chorches

filed the TAC (ECF No. 76), which repleads Count One—the alleged making of false statements

and false claims in violation of the FCA—but not Count Two—the retaliation claim. Because

Chorches makes no attempt to replead the retaliation claim, that claim is dismissed with

prejudice.[1] On May 11, 2015, AMR moved to dismiss the TAC. (ECF No. 77.)

### B.    Relevant Facts

According to the TAC, AMR is the largest ambulance company in the country. (TAC at ¶

8.) Fabula worked as an Emergency Medical Technician ("EMT") in AMR's New Haven,

Connecticut, branch office from August 2010 until December 25, 2011. (*Id.* ¶ 9.) Fabula's job as

an EMT involved performing emergency and non-emergency medical transport services in New

Haven, Fairfield County, Greater Hartford/Northeast Connecticut, and Waterbury/Farmington

Valley. (*Id.* ¶¶ 9-11.)

The TAC alleges that AMR has (1) "knowingly presented or caused false records or

statements to be presented to the United States for the purpose of getting a false or fraudulent

claim paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)" and (2)

"knowingly made, used or caused to be made or used false records or statements material to false

or fraudulent claims to the United States for the purpose of getting false or fraudulent claims paid

by the United States in violation of 31 U.S.C. § 3729(a)(2)."[2] (*Id.* ¶¶ 193-94.) Specifically,

---

[1] On April 3, 2015, the Court issued an order permitting the plaintiff to replead both Count One and Count Two of the SAC. (ECF No. 75.)  As noted, the plaintiff has chosen to replead only Count One.

[2] These subsections were amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA") Pub. L. No. 111-21, § 4(a), 123 Stat 1617, 1621. As amended, they make liable any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or

Chorches alleges that "AMR knowingly, systematically, and/or with willful disregard submitted claims for payment for ambulance transports that failed to meet Medicare and Medicaid coverage criteria with regard to medical necessity, and thus submitted false claims in violation of the False Claims Act." (*Id*. ¶ 195.)

Medicare, a federal health insurance program for people ages 65 and older, and certain others, *see* 42 U.S.C. § 1395c, does not reimburse AMR for ambulance transports (*i.e.* "runs") that are not "medically necessary." (TAC ¶ 13.) "[M]edical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated." (*Id.* at ¶ 15.) "[I]n any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance services." (*Id.*) The Medicare Benefit Policy Manual provides that "payment is based on the level of services furnished (provided they were medically necessary), not simply on the vehicle used. Even if a local government requires an ALS [Advanced Life Support] response for all calls, payment . . . is made only for the level of service furnished, and then only when the service is medically necessary." (*Id.* ¶ 17 (*citing* Medicare Benefit Policy Manual §10.2.2.).) Thus, in order to receive reimbursement from Medicare, AMR was "required to review and submit information about the condition of patients, and the emergency or non-emergency medical services [it] provided" during transports. (*Id.* ¶ 173.)

---

statement material to a false or fraudulent claim." *Id*. § 3729(a)(1)(B). Paragraph 167 of the TAC correctly cites these amended provisions.

Each time AMR dispatched an ambulance to transport someone, the participating paramedics and EMTs were required to complete an electronic Patient Care Report ("PCR").[3] (*Id.* ¶ 23.) Paramedics and EMTs included the following information in PCRs: the date, time, and address of the pickup; the name of the person being transported; the name of the medical facility to which the person was transported; and a description of the condition of the person being transported. (*Id.* ¶¶ 25-26.) The TAC alleges that the description of the transported person's condition identifies whether a run is "medically necessary," and thus reimbursable by the federal government. (*Id.* ¶ 26.) According to the TAC, "AMR was not in the habit of training its employees – Fabula and others – to recognize medical conditions in a patient that would require and qualify the patient for an ambulance for safe travel, or teach proper documentation for billing and patient care accuracy." (*Id.* ¶ 126.) Despite this lack of training, Fabula "fully understood which of the ambulance runs that he performed for AMR comprised 'medically necessary' transportation . . . and the electronic PCRs that he prepared . . . accurately reflected whether or not a run was reimbursable under Medicare." (*Id.* ¶ 27.)

### 1.    General Allegations

The TAC alleges that AMR often required paramedics and EMTs, including Fabula, to "revise" or "recreate" PCRs. (*Id.* at 28-29.) Specifically, AMR supervisors "made ambulance personnel come back to the office to redo paperwork, saying that the 'run form' did not 'meet company standards' (translation: Medicare wouldn't pay). . . . And so the real meaning behind redoing the paper work was this: 'This run is not billable to Medicare, so if you know what's good for you, you'll come back and redo it so it is.'" (*Id.* ¶ 52-53, 92.)

---

[3] It is not clear from the TAC whether Medicare required a PCR, or whether it was required only by AMR.

AMR supervisors could not make changes to the PCRs themselves because the paramedics and EMTs had the unique log-in passwords that were required to complete electronic PCRs. (*Id*. ¶ 48.) Therefore, AMR supervisors hand-wrote changes onto printouts of PCRs that "altered the substance of the original electronic PCRs so as to re-describe medically unnecessary runs[] as medically necessary runs." (*Id*. ¶¶ 29-30.) AMR then forced paramedics and EMTs to make such changes to the electronic PCRs "under threat of suspension or termination." (*Id.* ¶¶ 33-34.)  Even "when medical treatment was not required, AMR nonetheless required its employees, under threat of discontinuing their employment, to change the PCRs to qualify for Medicare reimbursement." (*Id*. ¶ 47.)

The supervisors who ordered these changes—directly or through their subordinates—included Jeffrey Boyd (Director of Clinical Service), Russell Pierson (Operations Supervisor), and Lindsay Martus (Transportation Authorization Department Supervisor). (*Id.* ¶ 32.) Each day, when the paramedics and EMTs punched in and out before and after their shifts, the supervisors gave them "paperwork that needed to be 'redone,' with notes providing instructions as to how the PCRs should be modified and changed with false information . . . ." (*Id.* ¶ 38.)

After the paramedics and EMTs made the changes to the electronic PCRs, AMR shredded the printouts containing the handwritten changes. (*Id*. ¶ 36, 49.) The TAC alleges that the purpose of the changes was "to qualify the run for Medicare reimbursement." (*Id*. ¶ 33.) The TAC further alleges that "the false claims based upon improper revising or recreating of . . . PCRs can be readily identified by, and from, the existence of multiple versions of electronic PCRs for any particular run that has been submitted to Medicare for payment – *i.e.*, information within the possession, custody, or control of AMR," (*id*. ¶ 110, 114) and its billing department known as "TAD." (*Id*. ¶ 116.)

The TAC describes, in general terms, the types of changes that AMR personnel made to PCRs. For example, Medicare would reimburse the transport of a patient with dementia only if the patient had a medical history of violence. (*Id.* ¶ 39.) Although approximately 40% of AMR's calls were for patients that suffered from dementia or Alzheimer's disease, "very few of these . . . patients actually met Medicare's requirements for an ambulance." (*Id.*) Therefore, the TAC alleges that "AMR supervisors routinely, on a daily basis . . . informed the EMTs, when they were being ordered to change the PCR forms, that 'Medicare is not paying for the dementia patient the way you have it written.'" Under threat of adverse employment action, EMTs "were routinely required to change the histories with Alzheimer's patients – so that the history included in the PCR a component of 'violence' – in order to qualify for Medicare." (*Id.*)

The TAC further alleges that when patients' recent medical histories did not provide a medically necessary reason for an ambulance transport, AMR employees were encouraged to call the dispatch center, located in New Haven, Connecticut, which kept "patients' histories and records from all across Connecticut on file." (*Id.* ¶ 86.) "The Dispatch Center then looked into the patient's past history to find a past reason for the transport, one that would qualify for Medicare reimbursement." (*Id* ¶ 87.) For example, Fabula called dispatcher Tom DellaValle to determine a "medical necessity reason" why a particular patient needed an ambulance. "DellaValle, being a dispatcher who had access to the patient's records, said, 'Well, she had a hip fracture three years ago.' So Fabula wrote on the PCR form, 'Hip fracture,' as though it had just occurred, and, on information and belief, the run was processed for Medicare reimbursement." (*Id.* ¶ 105.)

In addition to PCRs, the TAC alleges that AMR employees falsified Physician Certification Statements ("PCSs"), which are forms that "Medicare regulations require

physicians or registered nurses to complete." (*Id*. ¶ 54.) Often, "the AMR employee at the hospital filled out the PCS forms for the nurses, and then led the nurses to believe they were signing a form solely for AMR's record-keeping," when in fact "the forms they were signing were being submitted to Medicare." (*Id*.) "When AMR ambulance personnel could not find a reason why the patient needed to go by ambulance . . . the liaison person at the hospital (the AMR employee) looked into that person's medical history in order to find a reason why that person needed an ambulance, and he or she instructed the nurse on what needed to be written in the PCS."[4] (*Id*.)

### 2. Detailed Allegations

The TAC also describes certain runs in more detail, providing the names of patients and AMR employees, the dates and locations of transports, and some specific facts suggesting a fraudulent scheme. For example, the TAC alleges that two months after a run on December 4, 2011, Fabula was ordered "to come into the office and . . . input information electronically in order to falsify a PCR." (*Id*. ¶ 56, 71.) On the run in question, Fabula had assisted paramedic Kevin Bodiford, who had completed the original PCR. (*Id*. ¶ 57.) They had transported a patient from a third floor apartment in New Haven, Connecticut, to Gaylord Hospital. (*Id*. ¶ 71.) "For several weeks after that run date, Fabula witnessed verbal exchanges between . . . Bodiford and Pierson in which Pierson repeatedly instructed Bodiford that he needed to revise his original electronic PCR so that it could be submitted to Medicare for payment." (*Id*. ¶ 58.) Bodiford refused (*id*. ¶ 59), and then told Pierson that Fabula was responsible for the run. (*Id*. ¶ 60.)

---

[4] The TAC also alleges that "[r]egularly, when Fabula picked up patients in Waterbury, the nurse at the hospital simply left a signed PCR on the desk with no information filled out, and Fabula along with the ambulance personnel were instructed by management to fill this in themselves with a medically necessary reason for the run." (TAC ¶ 88.) Nothing else in the TAC suggests that nurses needed to sign PCRs, however. Thus, it seems likely that this paragraph was intended to refer to PCSs, which, according to the TAC, required a signature from a nurse or physician.

Thereafter, Pierson attempted to get Fabula to revise the PCR. (*Id*. ¶ 61.) Fabula was out on sick

leave after December 25, 2011, (*id*. ¶ 62), so in February 2012, Pierson contacted Fabula by e-

mail, explained that the original PCR had been lost, (*id*. ¶ 63), and ordered Fabula "to return to

AMR to recreate an electronically filed PCR . . . ." (*Id*. ¶ 62.) The TAC alleges, however, that

"'losing' a run form was virtually impossible" with the computerized billing system. (*Id*. ¶ 64.)

Fabula responded that he was uncomfortable with the request. (*Id*. ¶ 65.) Fabula returned to work

that month and Pierson told him: "[y]ou should be able to complete the PCR with the

information I've provided. I have the patient information. I just need the PCR recreated for

billing purposes." (*Id*. ¶ 66.) "Pierson then placed before Fabula information that was (and is)

used to determine if a patient needs an ambulance, and also if the patient needs the level of care

that AMR is billing Medicare for," (*id*) and told Fabula to input the following information into

the electronic PCR:

> Patient with history for advanced stage multiple sclerosis and is bed confined with
> severe contraction of the hands, arms, hips, legs and feet. Patient going to Gaylord
> Hospital for bactofin trail/ Testos procedure. Patient also with decubilis ulcer on
> lower back. Patient had no changes en route to facility. Patient left in room with
> staff.

(*Id*. ¶¶ 67, 72.) In addition, the form said: "Time at Scene: 6:43.05" and "Time at [Patient's]

Side: 6:44.05." (*Id*. ¶ 75.) The TAC states that "[t]hese words were not Fabula's words. He

would never put 'bactofin trail/Testos procedure' into a PCR; in fact, he didn't even know what

these words meant." (*Id*. ¶ 74.) In addition, "[n]o EMT is at the patient's side one minute after

arrival. He needs between 5 and 10 minutes just to unload all his equipment from the

ambulance," (*id*. ¶ 75) and reaching the third floor of an apartment building "would require even

more time." (*Id*. ¶ 76.) Thus, the TAC states that "Fabula was being asked to falsify a document

in order to have Medicare pay." (*Id*.) Fabula did not revise the PCR as Pierson requested. (*Id*. ¶ 79.)

Fabula then received a letter from AMR dated March 1, 2012, stating: "Please contact this office immediately to arrange a time for reconciliation and transmission of this EPCR [electronic PCR]. Failure to do so will result in corrective action up to and including termination." (*Id*. ¶ 78.) Fabula refused to change the PCR (*id*. ¶ 79), and "was placed on administrative leave 'until he completed the document.' He was told by Pierson that his refusal 'was a direct violation of [the] company's standard operating procedure.'" (*Id*. ¶ 80.) Since Fabula never returned to revise the PCR, he was effectively terminated. (*Id*. ¶ 81.) As a result of Fabula's refusal to change the PCR, AMR "was not successful in submitting its claim for payment to Medicare for the transport that is supposed to have occurred on December 4, 2011." (*Id*. ¶ 83.)

On another occasion, for which the TAC does not provide a date, Fabula arrived at a hospital after receiving a request for a transport "to find a patient sitting on a stretcher saying, 'Take me home.' Fabula went to AMR's hospital liaison (a woman named Nancy) and said, 'Why does this person need an ambulance?'"[5] (*Id*. ¶ 84.) Nancy said that the patient had cancer. Fabula said, "'The patient doesn't get Medicare for this,' so Nancy put down dementia. Then when Fabula said, 'Dementia is not covered unless the patient is violent or wandering,' Nancy went back and found something in the hospital record about an incident 3 years ago. 'The patient has violent tendencies,' she said, and put down that, 'Today, the patient is violent.'" (*Id*. ¶ 85.)

On July 7, 2011, paramedic William Shick and Fabula transported several patients to the hospital based on 911 calls. (*Id*. ¶ 102.) Two weeks later, Fabula was asked to revise their PCRs.

---

[5] Because paragraph 54 of the TAC identifies Nancy Terenzo as a hospital liaison at an unnamed hospital, it appears that this paragraph also refers to Nancy Terenzo.

(*Id.*) "These patients were on Medicaid and Fabula was told he had to write in previous surgeries and injuries to justify their need for transport. One of them . . . wanted a ride to the hospital because she felt she could 'skip the line' if an ambulance brought her in. She was going in for a chronic allergy issue. Another was from the homeless shelter in New Haven, and called 911 because he didn't feel like he should have to buy cough syrup." (*Id.*)

AMR transported a patient to and from dialysis appointments three times per week all summer long in 2011. Although the patient could not stand and walk at first, "after a short period of time, he was able to walk and to sit up on a stretcher." (*Id.* ¶ 109.)

Fabula transported a patient for a medical appointment on October 17, 2011. The transport was canceled, however, because it was the wrong date for the medical appointment. Nevertheless, "AMR still required Fabula to complete a return trip PCR, as if the patient had been transported twice, when in fact he was only transported one time." (*Id.* ¶ 101.)

On December 4, 2011, EMT Douglass Gladstone and Fabula assisted in transporting an obese patient who, according to the TAC, "had no medical reason to be sent to the hospital, he simply wanted to go there." (*Id.* ¶ 100.) The patient "was able to walk himself to the stretcher, and climb on unassisted." (*Id.*) Nevertheless, "AMR instructed Fabula to write down [the patient's] previous surgeries to justify his transport to the hospital." (*Id.*) The TAC also alleges that the same patient "called 911 for an ambulance on a daily basis - six dozen times during 2011 - to bring him to his medical facility - for his insulin." (*Id.* ¶ 108.) For these runs, "Fabula was directed . . . to change and falsely certify . . . the PCRs in order to say that [the patient] had difficulty remaining in an upright position in order to qualify . . . [the] runs . . . for Medicare/Medicaid reimbursement. . . . [U]pon information and belief they were submitted to Medicare for payment." (*Id.*)

Ten days later, on December 14, 2011, Amy Baitch and Fabula transferred two patients between medical facilities. According to the TAC, the first "patient was alert and oriented, able to stand and pivot, and had no reason to travel by ambulance except for the fact that AMR placed the calls as '911,' rather than standard transport, and thus Medicare was billed for the transport." (*Id.* ¶ 97.) The second "patient could have traveled by other means, but the call was placed as a 911 call rather than a scheduled transport and on information and belief, Medicare was billed." (*Id.* ¶ 98.)

Two days later, on December 16, 2011, Paul Zadrozny, then an AMR dispatcher, offered Fabula a run transporting a patient from New Haven to Guilford, Connecticut. Zadrozny told Fabula that Fabula "would be required to fill in the paperwork properly to ensure Medicare would pay the bill. AMR wanted Fabula to write 'patient is unable to sit at a 90 degree angle due to hip fracture.' However, the hip fracture . . . was over 5 years earlier, and the patient had already fully recovered." (*Id.* ¶ 96.)

The TAC makes several other allegations regarding specific AMR employees, but the allegations themselves are general, and do not refer to specific transports or fraudulent activities:

- Oliver Tatum, a paramedic, told Fabula that "[h]e was very uncomfortable with AMR 'putting their words on our paperwork.'" (*Id.* ¶ 94.)

- EMT Ronald Deline got in trouble on December 25, 2011, "for submitting paperwork that was not reimbursable by Medicare." Deline "was angry that AMR was 'trying to tell him the condition of his patients.'" (*Id.* ¶ 95.)

- EMT Rich Acampora "complained to Fabula in 2011 how it had gotten really bad, saying, 'They want you to write what they want on the form every time . . .'" (*Id.* ¶ 103.)

- EMT Rob Phelan, apparently angry and overwhelmed by all the paperwork he had been ordered to redo, told Fabula that he would "make them pay." Phelan then arranged to complete the paperwork after hours so that AMR would have to pay him overtime for doing so. (*Id.* ¶ 104.)

### 3.  Corporate Integrity Agreement

In May of 2011, AMR entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the Department of Health and Human Services. (*Id*. ¶ 118.) As part of the CIA, AMR promised to comply with Medicare's statutes, regulations, and written directives. (*Id*.) The TAC alleges, however, that "AMR used this CIA to shield its continuing practice of defrauding the government and maximizing its reimbursement of funds to which it was not entitled." (*Id*. ¶ 126.) "In early summer of 2011 . . . all AMR ambulance personnel were required to attend companywide sessions for training to address AMR's 'new documentation policies.'" (*Id*. ¶ 127.) Boyd told ambulance employees that New Haven received reimbursement from Medicare for 40% of its runs, while other AMR locations were reimbursed for closer to 70% of their runs. (*Id*. ¶ 131.) The TAC alleges, on information and belief, that AMR's goal after signing the CIA was to increase New Haven's reimbursements from Medicare to 70% of its runs. (*Id*. ¶ 132.)

Boyd also told New Haven ambulance employees that "[p]oor documentation leads to calls not being paid for," (*id*. ¶ 133), and that a new software program would help "guide" employees to prepare "better" PCRs. (*Id*. ¶ 134.) "Ambulance personnel understood 'better' to mean getting more of the ambulance runs to qualify for Medicare reimbursement." (*Id*. ¶¶ 134, 136.) Boyd told AMR ambulance personnel that Medicare would pay "only when key words and descriptions" are in the electronic PCRs. (*Id*. ¶¶ 135, 136.) Once clicked or checked, the fields in the new software program auto-filled "the requirements necessary to get Medicare to pay." (*Id*. ¶ 138.) The new software program apparently required that the box for "paramedic assessment" or Advance Life Support ("ALS") assessment be checked in order for a PCR to be processed. (*Id*. ¶ 142.) Such assessments involved "advanced medical monitoring or care with heart monitoring,

medications, [or] advanced airways." (*id.* ¶ 144), and were billed to Medicare at $1,200 each. (*Id.* ¶ 143.) AMR's new software automatically checked "paramedic assessment" if a paramedic was present in the ambulance, even if such an assessment was not necessary and was not performed. (*Id.* ¶¶ 146, 147.) "The result was that Medicare automatically was billed . . . $1,200." (*Id.* ¶ 147.) The TAC also alleges that the new software would automatically describe every patient as "bed confined," regardless of the patient's actual condition. (*Id.* ¶ 148.) AMR "programm[ed] its software to bill at the highest level of care possible in order to qualify for Medicare reimbursement." (*Id.* ¶ 140.)

Despite these automations in the new software, the number of PCRs that each EMT was asked to correct or redo increased from several to about 30 per shift. (*Id.* ¶¶ 150-153.) In 2011, someone asked Boyd "if the new (but illegal and fraudulent) way of completing the PCRs 'was working' – whether the effort to increase Medicare billings (no matter by what means) 'was working,'" and "Fabula heard Boyd respond, 'Hey, it's working.'" (*Id.* ¶ 163.)

## II.   <u>LEGAL STANDARDS</u>

### A.   **Rule 12(b)(6)**

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570. Under *Twombly*, the Court accepts as true all of the complaint's factual allegations when evaluating a motion to dismiss. *Id.* at 572. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). For a complaint to survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from

conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010).

### B.    The FCA and the Rule 9(b) Requirement of Particularity

Under the FCA, private individuals, known as "relators," may file *qui tam* actions and recover damages on behalf of the United States from any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). "Claim" means "any request or demand . . . for money or property" that: "(i) is presented to an officer, employee, or agent of the United States," or "(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A). "The submission of a false claim to the government is the cornerstone of any fraud claim pursuant to the FCA," *Johnson v. The Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 266 (W.D.N.Y. 2010), and such a submission "is an essential element of causes of action under subsections (a)(1)(A) and (a)(1)(B)." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014) ("*Novartis II*"); *see also, U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 243 (1st Cir. 2004) (The FCA "attaches liability to the submission of false claims for payment, not to the underlying fraudulent activity or other wrongful conduct on which those claims were based.") *abrogation on other grounds recognized by U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 46 (1st Cir. 2009); *U.S. ex rel. Clausen*

*v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) ("The submission of a claim is . . . the *sine qua non* of a False Claims Act violation.").

"[C]laims brought under the FCA fall within the express scope of Rule 9(b)" of the Federal Rules of Civil Procedure, *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995), which requires that a party "alleging fraud or mistake . . . state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "To satisfy this requirement the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal citation and quotation marks omitted). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04-CV-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (internal citation and quotation mark omitted).

The heightened pleading standard under Rule 9(b) has several purposes: "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal citation and quotation marks omitted). Another purpose of Rule 9(b) "is to discourage the filing of complaints as a pretext for discovery of unknown wrongs." *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (internal citation and quotation marks omitted). That purpose is an apt one for FCA claims, which are brought by private parties for wrongs done to another, *i.e.,* the United States government. "The reluctance of courts to permit qui tam relators to use discovery to meet the requirements of Rule 9(b) reflects, in part, a concern that a qui tam plaintiff, who has

suffered no injury in fact, may be particularly likely to file suit as a pretext to uncover unknown

wrongs." *Karvelas*, 360 F.3d at 231 (internal quotation marks and citation omitted).

"Although the Second Circuit has not explained exactly what Rule 9(b) demands of FCA

claims, the weight of authority from district courts within this Circuit is that where an alleged

FCA violation involves the submission of a false claim to the Government for reimbursement,

the details of that false claim must be pled with particularity." *U.S. ex rel. Moore v.*

*GlaxoSmithKline, LLC*, No. 06 CIV. 6047 BMC, 2013 WL 6085125, at *3 (E.D.N.Y. Oct. 18,

2013) (internal citation and quotation marks omitted) (collecting cases); *see U.S. ex rel. Kester v.*

*Novartis Pharm. Corp.*, No. 11 CIV. 8196 CM, 2014 WL 2619014, at *5 (S.D.N.Y. June 10,

2014); *Novartis II* at 257 (collecting cases); *U.S. ex rel. Mooney v. Americare, Inc.*, No. 06-CV-

1806 FB VVP, 2013 WL 1346022, at *3 (E.D.N.Y. Apr. 3, 2013); *Johnson*, 686 F. Supp. 2d at

267 (collecting cases); *Wood ex rel. U.S. v. Applied Research Associates, Inc.*, 328 F. App'x 744,

750 (2d Cir. 2009) (summary order) (quoting, with approval, the district court's statement that

the complaint "do[es] not cite to a single identifiable record or billing submission they claim to

be false, or give a single example of when a purportedly false claim was presented for payment

by a particular defendant at a specific time."); *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d

58, 86-87 (D. Conn. 2006). Thus, an FCA complaint must include "details that identify particular

false claims for payment that were submitted to the government," such as:

> details concerning the dates of the claims, the content of the forms or bills
> submitted, their identification numbers, the amount of money charged to the
> government, the particular goods or services for which the government was billed,
> the individuals involved in the billing, and the length of time between the alleged
> fraudulent practices and the submission of claims based on those practices. . . .
> These details do not constitute a checklist of mandatory requirements that must be
> satisfied by each allegation included in a complaint. However, . . . we believe that
> some of this information for at least some of the claims must be pleaded in order
> to satisfy Rule 9(b).

*Karvelas,* 360 F.3d at 233 (internal quotation marks and citations omitted).

> In sum, a plaintiff asserting a claim under subsection (a)(1)(A) or (a)(1)(B) must plead the submission of false claims with a high enough degree of particularity that defendants can reasonably identify particular false claims for payment that were submitted to the government. The details included in the complaint must fulfill the purposes of Rule 9(b) by both (1) identifying which of the claims the defendant submitted were "false," and (2) providing a factual basis to support the plaintiff's assertion that claims were actually submitted to a government program.

*Novartis II*, 23 F. Supp. 3d at 260 (internal quotation marks and citations omitted).

## III.   DISCUSSION

Chorches argues that, "the TAC sufficiently alleges numerous false claims by AMR." (Plaintiff's Opposition Brief, ("Pl.'s Opp. Br."), ECF No. 80 at 1.) He argues that the "who" in the TAC is AMR, the "what" is "the submission of claims for payment for ambulance transports that were misrepresented as being 'medically necessary,'" (Pl.'s Opp. Br. at 6), the "where" is the submission of false claims to Medicare and Medicaid, the "when" is "the occurrence dates of transports misrepresented as medically necessary," (*id.* at 8), and the "how" is AMR's directing its personnel "to alter or create PCRs indicating that medically unnecessary transports[] were medically necessary, so that the transports could be billed to Medicare or Medicaid." (*Id.* at 9.) Chorches contends that by "identifying particular people . . . for whom ambulance transports were misrepresented as medically necessary, the TAC undeniably identifies the 'what' of certain false claims with precision." (*Id.* at 6.) While the TAC does describe multiple ambulance transports, and often identifies the patients, the locations to and from which the patients were transported, and the dates of the transports, it does not provide details about any false claims that were actually submitted to the federal government for reimbursement.[6]

---

[6] Thus, as AMR points out, Chorches's reliance on *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318 (D. Conn. 2004) is misplaced. In that case, the government "described in detail the alleged violations of the FCA and . . . provided categorical information in the complaints about the actual claims that were

For many of the transports it describes, the TAC does not allege that AMR ever submitted false claims to the federal government for reimbursement. For example, on one occasion, Fabula was assigned to transport a patient, and when he asked AMR's hospital liaison why the patient needed an ambulance, she told him that the patient had cancer. (TAC ¶¶ 84-85.) When Fabula explained that Medicare would not cover the transport, the liaison "put down dementia." (*Id.* ¶ 85.) When Fabula explained that dementia is not covered unless the patient is violent or wandering, the liaison "went back and found something in the hospital record about an incident 3 years ago. 'The patient has violent tendencies,' she said, and put down that, 'Today, the patient is violent.'" (*Id.*) The TAC does not allege that a claim related to this transport was ever submitted to Medicare or Medicaid. The allegations about this transport also fall short of the Rule 9(b) standard for other reasons, including that no date is provided, the hospital is not identified, and the document in which the hospital liaison allegedly wrote "Today, the patient is violent" is not specified.

Similarly, there are no allegations that AMR ever submitted any false claims to the federal government for reimbursement for the following transports described in the TAC:

- On July 7, 2011, Shick and Fabula transported several patients to the hospital based on 911 calls. (*Id.* ¶ 102.) "One of them . . . wanted a ride to the hospital because she felt she could 'skip the line' if an ambulance brought her in. She was going in for a chronic allergy issue. Another was from the homeless shelter in New Haven, and called 911 because he didn't feel like he should have to buy cough syrup." (*Id.*) Two

---

submitted to the Government, listing the number of false claims involving a particular device." *Cardiac Devices*, 221 F.R.D. at 336. The government provided spreadsheets to the defendants, some of which "included the specific amount of the Medicare or Medicaid reimbursement for the specific procedure." *Id.* Thus, the *Cardiac Devices* court found that "the complaints . . . read in conjunction with the patient lists provided to the hospitals . . . sufficiently identified the submission of specific false claims. This is not a situation where only a general scheme of fraud was alleged that might have resulted in the submission of false claims." *Id.* By contrast, the TAC alleges, in some detail, a scheme of fraud, *i.e.* falsely completing PCRs, but it does not identify or describe with particularity any specific false claims that were actually submitted to the federal government for payment.

weeks later, Fabula was asked to revise their PCRs. "Fabula was told he had to write in previous surgeries and injuries to justify their need for transport." (*Id.*)

- AMR transported a patient to and from dialysis appointments three times per week all summer long in 2011. Although the patient could not stand and walk at first, "after a short period of time, he was able to walk and to sit up on a stretcher." (*Id.* ¶ 109.)[7]

- Fabula transported a patient for a medical appointment on October 17, 2011. The transport was canceled, however, because it was the wrong date for the appointment. Nevertheless, "AMR still required Fabula to complete a return trip PCR, as if the patient had been transported twice, when in fact he was only transported one time." (*Id.* ¶ 101.)[8]

- On December 16, 2011, Zadrozny offered Fabula a run transporting a patient from New Haven to Guilford, Connecticut. Although the patient had a hip fracture and replacement five years earlier, and had fully recovered, Zadrozny told Fabula that "AMR wanted Fabula to write 'patient is unable to sit at a 90 degree angle due to hip fracture.'" (*Id.* ¶ 96.)[9]

Moreover, "some of the [allegations] tend[] to show that fraudulent bills were *not* submitted." *Smith*, 415 F. Supp. 2d at 88. For example, after a run on December 4, 2011, "Pierson repeatedly instructed Bodiford that he needed to revise his original electronic PCR so that it could be submitted to Medicare for payment." (TAC ¶ 58.) After Bodiford refused, Pierson told Fabula, "[y]ou should be able to complete the PCR with the information I've provided. I have the patient information. I just need the PCR recreated for billing purposes." (*Id.* ¶ 66.) The TAC alleges that as a result of Bodiford's and Fabula's refusals to change the PCR, AMR "was *not* successful in submitting its claim for payment to Medicare for the transport that is supposed to have occurred on December 4, 2011." (*Id.* ¶ 83 (emphasis added).) Thus, the TAC

---

[7] With respect to this transport, there is also no allegation that false entries about the patient were made in a PCR or other documents.

[8] With respect to this transport, there is also no allegation that the patient was eligible for Medicare or Medicaid.

[9] With respect to this transport, there is also no allegation that the patient was eligible for Medicare or Medicaid or that a false entry was actually made in a PCR or other document.

affirmatively states that this claim was never actually submitted to the federal government for payment.

In other cases, the TAC tacks on to the end of a description of a specific transport the conclusory allegation—often pled on "information and belief"—that the transport services provided were "billed to Medicare." For example, the TAC includes the following allegations:

- An obese patient "called 911 for an ambulance on a daily basis - six dozen times during 2011 - to bring him to his medical facility - for his insulin." (TAC ¶ 108.) For these runs, "Fabula was directed . . . to change and falsely certify . . . the PCRs in order to say that [the patient] had difficulty remaining in an upright position in order to qualify . . . [the] runs . . . for Medicare/Medicaid reimbursement. . . . [U]pon information and belief they were submitted to Medicare for payment." (*Id.*)

- On December 14, 2011, Baitch and Fabula transferred two patients between medical facilities. The first "patient was alert and oriented, able to stand and pivot, and had no reason to travel by ambulance . . . ." (*Id.* ¶ 97.) The second "patient could have traveled by other means, but the call was placed as a 911 call rather than a scheduled transport and on information and belief, Medicare was billed." (*Id.* ¶ 98.)

- Fabula called dispatcher Tom DellaValle to determine why a particular patient needed an ambulance. "DellaValle, being a dispatcher who had access to the patient's records, said, 'Well, she had a hip fracture three years ago.' So Fabula wrote on the PCR form, 'Hip fracture,' as though it had just occurred, and, on information and belief, the run was processed for Medicare reimbursement." (*Id.* ¶ 105.) [10]

Such conclusory allegations as to the core FCA element that a false request for payment was submitted to the government do not satisfy the particularity requirement of Rule 9(b).

Chorches ultimately recognizes that he cannot plead the submission of actual false claims to the government with particularity, and seeks to be excused from this requirement on the ground that billing information is in the custody and control of AMR:

> While AMR required that its EMTs and Paramedics personally certify whether ambulance runs were medically necessary – whether they were actually medically

---

[10] The TAC also alleges, generally, that AMR's new software automatically checked "paramedic assessment" if a paramedic was present in the ambulance, even if such an assessment was not necessary and was not performed. (*Id.* ¶¶ 146, 147.) "The result was that Medicare automatically was billed . . . $1,200." (*Id.* ¶ 147.)

> necessary or not – AMR did not invite or require either Fabula or any of its other ambulance personnel to participate in the billing procedures. . . . [T]hey were not involved in billing Medicare or Medicaid for their ambulance runs. This was a task delegated to those in the billing department at AMR. As a result, specific information about AMR's submissions to Medicare – in the fraudulent PCRs by AMR emergency personnel – is information particularly within the knowledge and control of, and access to, the defendant, AMR, and not accessible by any paramedics or EMTs such as Fabula.

(*Id*. ¶ 115.) In making this allegation, Chorches seeks to invoke the more "relaxed" pleading standard applicable—even for allegations subject to Rule 9(b)—when the relevant facts are not accessible to the pleader. More specifically, "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (citations omitted). Such a "relaxed pleading standard," however, "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations . . . . [A] complaint must adduce specific facts supporting a strong inference of fraud . . . ." *Id*. (internal citations omitted). A plaintiff who pleads based on information and belief "must still set forth the factual basis for that belief, and that basis must arise from the plaintiff's direct, independent, firsthand knowledge."[11] *Johnson*, 686 F. Supp. 2d at 266.

The TAC does not satisfy this "relaxed" standard because it does not plead the factual basis for the relator's belief that "Medicare was billed." This is not merely a technical omission. There are allegations in the TAC that suggest that many of the transports provided by AMR were not billed to the government at all. The TAC pleads that before AMR signed the CIA in May

---

[11] Courts have also relaxed the pleading requirements of Rule 9(b) in cases "involv[ing] complex or extensive schemes of fraud." *Cardiac Devices*, 221 F.R.D. at 333. "[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct," instead allowing the relator to describe specific examples of false claims. *Id*. Here, as noted, the TAC does not provide a single specific "example" of a false claim submitted to the government.

2011, "a relatively low percentage of [AMR's] ambulance runs" out of the New Haven office where Fabula worked were "being billed to Medicare." (TAC ¶ 130.) The TAC suggests that this percentage was approximately 40% before the CIA was signed, and that after it was signed, AMR sought to raise that percentage to 70%. (*Id*. ¶ 131.) The TAC thus suggests that only 40% to 70% of AMR's transports were being billed to the government—the remainder presumably being billed either to private payors or to no one at all. Especially because the TAC itself suggests that the odds were roughly fifty percent that any given transport was *not* billed to the government, the failure to allege with specificity the basis for the relator's belief that a particular transport was billed to the government, as opposed to a private payor or to no one at all, is a fatal omission.

Chorches argues that allegations in the TAC regarding the purpose of the scheme to revise the PCRs provide an indication of the basis for his belief that specific transports were being billed to the government. For example, the TAC alleges that:

- "Fabula was informed by Boyd, Pierson, and Martus, that the revisions were required to qualify the run for Medicare reimbursement." (*Id*. ¶ 33) AMR supervisors gave EMTs "notes providing instructions as to how the PCRs should be modified and changed with false information – which then was inputted electronically . . . – in order to qualify the runs for Medicare reimbursement" (*Id*. ¶ 38);

- "AMR supervisors routinely, on a daily basis . . . informed the EMTs, when they were being ordered to change the PCR forms, that 'Medicare is not paying for the dementia patient the way you have it written.'" (*Id*. ¶ 39.) Under threat of adverse employment action, EMTs "were routinely required to change the histories with Alzheimer's patients – so that the history included in the PCR a component of 'violence' – in order to qualify for Medicare." (*Id*.);

- Even "when medical treatment was not required, AMR nonetheless required its employees, under threat of discontinuing their employment, to change the PCRs to qualify for Medicare reimbursement." (*Id*. ¶ 47);

- "Fabula witnessed verbal exchanges between . . . Bodiford and Pierson in which Pierson repeatedly instructed Bodiford that he needed to revise his original electronic PCR so that it could be submitted to Medicare for payment." (*Id*. ¶ 58.) After Bodiford refused, Pierson asked Fabula to enter certain information into the PCR "in

order to ensure that AMR could bill Medicare for the transport." (*Id.* ¶ 71.) Pierson said, "[y]ou should be able to complete the PCR with the information I've provided. I have the patient information. I just need the PCR recreated for billing purposes." (*Id.* ¶ 66.) The TAC states that, "Fabula was being asked to falsify a document in order to have Medicare pay." (*Id.* ¶ 76);

- For an obese patient, "Fabula was directed . . . to change and falsely certify . . . the PCRs in order to say that [the patient] had difficulty remaining in an upright position in order to qualify . . . [the] runs . . . for Medicare/Medicaid reimbursement. . . ." (*Id.* ¶ 108); and

- AMR "program[ed] its software to bill at the highest level of care possible in order to qualify for Medicare reimbursement." (*Id.* ¶ 140.)

But these allegations add little to the mix and fall short of satisfying Chorches's burden under Rule 9(b). First, with the exception of the PCR for the December 4, 2011 run that was never actually submitted to Medicare (described in the fourth bullet point above), there are no specific allegations—that is, no specification of a date or speaker—that anyone told Fabula that the purpose of requiring him to revise a PCR with respect to a particular transport was so that it could be billed to Medicare. And the TAC otherwise offers no facts suggesting that Fabula would have personal knowledge of the intent behind the instructions he was allegedly receiving. Second, alleging the purpose of the scheme to revise the PCRs ultimately amounts to little more than saying that the scheme was fraudulent, and it is well-established that it is not enough to plead that the underlying scheme was fraudulent in a FCA case; there must, in addition, be particularized allegations that a false claim was actually submitted to the government for payment. *Polansky*, 2009 WL 1456582, at *5 ("[A] relator cannot circumscribe the Rule 9(b) pleading requirements by alleging a fraudulent scheme in detail and concluding, that as a result of the fraudulent scheme, false claims must have been submitted.") (citing First, Third, Tenth, and Eleventh Circuit cases); *Johnson*, 686 F. Supp. 2d at 266 (noting that the "complaint offers nothing more than conclusory allegations and assumptions that the pattern of incidents the plaintiffs describe ever actually resulted in a fraudulent bill being submitted to Medicare and/or

24

Medicaid for payment."); *id.* at 268 ("Neither plaintiff has identified any particular case where a fraudulent bill was presented, nor have they provided any factual basis upon which to conclude that they personally observed or had reason to know that fraudulent claims were submitted. As such, their fraud claims must be dismissed."); *Novartis II* at 255 (under *Karvelas,* "both the fraudulent scheme and the submission of false claims must be pled with a high degree of particularity."); *U.S. ex rel. Smith,* 415 F. Supp. 2d at 87 (dismissing plaintiff's claims under "relaxed" standard for failure to plead fraud with particularity—despite relator's detailed description of the defendant's non-compliance with regulations—because relator merely provided conclusory allegations that the defendant "must have submitted claims for reimbursement from the Medicare program . . . for all such signed reports for Medicare patients"). Again, "actual false and fraudulent claims are the *sine qua non* of a False Claims Act litigation." *Polansky,* 2009 WL 1456582, at *5 (internal quotation marks and citations omitted). Here, the failure to plead facts showing that specific transports were actually billed to the government—especially when the TAC suggests approximately half were not—is a fatal omission.

Because the TAC does not provide a factual basis for its conclusory allegations that AMR submitted false claims to Medicare or Medicaid for reimbursement, it fails to satisfy Rule 9(b), even under the "relaxed" pleading standard. Therefore, the TAC is dismissed with prejudice.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, AMR's motion to dismiss (ECF No. 77) is GRANTED, and the Clerk is instructed to close this case.

One final matter: AMR argues that Chorches violated the Health Insurance Portability and Accountability Act ("HIPAA") by improperly disclosing patient names and medical

information in the TAC. Chorches is ordered to show cause, by November 20, 2015, why the

TAC should not be sealed to protect the confidentiality of the patients named, and a new,

redacted TAC filed replacing each patient's name with an anonymous identifier such as "Patient

A, Patient B," etc.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              November 6, 2015