# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES *ex rel.* PAUL FABULA, and PAUL FABULA, individually, | : : : | |
| Plaintiff-Relator | : : | CASE NO. 3:12-CV-921-MPS |
| v. | : : | |
| AMERICAN MEDICAL RESPONSE, INC., | : : | |
| Defendant. | : | September 16, 2019 |

_____

## RULING ON MOTION FOR SUMMARY JUDGMENT AND RELATED MOTIONS

### I.      Introduction

Plaintiff-Relator Paul Fabula brings this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against Defendant American Medical Response, Inc. ("AMR"). He brings a claim on behalf of the United States for false claims in violation of § 3729(a)(1)–(2) and a claim on his own behalf for retaliation in violation of § 3730(h). AMR has filed a motion for summary judgment on all claims, ECF No. 144, as well as a motion to exclude the testimony and report of one of Fabula's experts, ECF No. 143. Fabula has filed a motion asking the Court to deny or defer ruling on summary judgment until he has had the opportunity to take more discovery. ECF No. 157; *see* Fed. R. Civ. P. 56(d). For the reasons set forth below, AMR's motion for summary judgment is GRANTED in part and DENIED in part, Fabula's motion to deny or defer ruling on summary judgment is DENIED, and AMR's motion to exclude Fabula's expert is DENIED as moot.

### II.      Procedural History

I assume familiarity with the allegations in the Fourth Amended Complaint and the Second Circuit's opinion remanding this case. *United States* ex rel. *Chorches for Bankr. Estate*

*of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71 (2d Cir. 2017). I summarize the procedural history to provide additional context for the discussion that follows.

Paul Fabula filed this *qui tam* action against AMR as a relator on behalf of the United States on June 22, 2012. ECF No. 1. The United States gave notice that it declined to intervene on September 27, 2013. ECF No. 18. Fabula filed a second amended complaint ("SAC"), bringing a claim on behalf of the United States for violations of the FCA, 31 U.S.C. §§ 3729(a)(1) and (a)(2), and a claim on his own behalf alleging that AMR retaliated against him for refusing to assist in submitting a false claim, 31 U.S.C. § 3730(h). AMR moved to dismiss, arguing that the complaint did not state a claim for relief and that Fabula lacked standing to pursue his claims because he had filed for bankruptcy and the claims belonged to the bankruptcy estate. I dismissed Fabula's retaliation claim because I concluded that he had not alleged facts suggesting that he engaged in "efforts to stop 1 or more violations" of the FCA. *See* 31 U.S.C. § 3730(h). I also dismissed his FCA claim for lack of standing, but I stayed my decision to give the trustee of his bankruptcy estate an opportunity to join the case and pursue the claim. ECF No. 67.

The trustee of Fabula's bankruptcy estate, Chorches, joined the case and, on April 24, 2015, filed a Third Amended Complaint ("TAC") alleging violations of the FCA. AMR moved to dismiss the TAC for failure to state a claim, and I granted the motion on November 6, 2015. ECF No. 82. I concluded that the complaint did not satisfy the pleading standard in Fed. R. Civ. P. 9(b) because it did not allege with specificity that AMR had submitted false claims to the government for payment.

July 27, 2017, the Second Circuit vacated the dismissal of both claims, holding that the SAC stated a retaliation claim and that the TAC stated a claim under the FCA. *See Chorches*, 865 F.3d 71. With respect to the FCA claim, the court held that the TAC satisfied the standard in

Rule 9(b) because information about whether individual ambulance runs were billed to the government was "peculiarly within the knowledge of AMR," *id*. at 82, and the TAC had otherwise alleged "facts supporting a strong inference of fraud," *id*. at 83. With respect to the retaliation claim, the court held that the TAC had adequately pled that Fabula engaged in protected activity by alleging that he refused to falsify a single record that he believed would later form the basis of a false claim. *Id.* at 96–97

On appeal, AMR argued that the TAC was "an unjustified ticket to discovery," and that it might face undue pressure to settle the case to avoid significant litigation costs. *Id.* at 87. Responding to these concerns, the Second Circuit noted that the TAC had included specific allegations about several ambulance "runs" for which Fabula was directed to create false records. The court explained that these allegations were "amenable to a targeted discovery process that could lead to a swift resolution of the lawsuit . . . ." *Id.* The court elaborated:

> Where a qui tam relator identifies representative examples of false claims or, as here, makes allegations leading to a strong inference that specific false claims were submitted, defendants could initially be required to provide discovery only with respect to the cases identified in the complaint. If no genuine dispute of material fact is found to exist as to whether false claims were in fact submitted in that limited set of cases, the lawsuit would be at or near its end. *See* [*U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009)] ("discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations."). If the initial inquiry produces evidence that seems to bear out the complaint's assertions, however, the door could be open to broader discovery without fear of subjecting an innocent defendant to burdensome and unjustified inquiries. *See* TAC ¶¶ 110, 114 (stating that false claims not specifically alleged "can be readily identified by, and from, the existence of multiple versions of electronic PCRs for any particular run that has been submitted to Medicare for payment").

*Chorches*, 865 F.3d at 88 n.13.

On remand, the parties seized on this suggestion. *See* ECF No. 99 at 7 ("The parties agree that discovery in this matter should be bifurcated and phased as endorsed by the Second Circuit . . . ."). I adopted their request and bifurcated discovery. ECF No. 102. In Phase I, I ordered that

discovery would be limited to "(1) the specific claims and ambulance runs identified in the operative Complaint; (2) Fabula's retaliation claim; and (3) whether Mr. Fabula is judicially estopped from recovering on the False Claims Act claims . . . ." *Id.* at 1. I also limited dispositive motions following Phase I to those three topics. *Id.*

Fabula then sought leave to file a Fourth Amended Complaint to (1) substitute Fabula for Chorches as relator, since Fabula's bankruptcy proceeding had concluded; (2) join the retaliation claim, previously set forth in the SAC, with the FCA claim into a single complaint; and (3) make "some additional, non-substantive 'clean-up' changes." ECF No. 106; ECF No. 113. I granted the motion to amend, ECF No. 115, and Fabula's Fourth Amended Complaint, ECF No. 105, became the operative complaint.

## III.    Facts Developed in Phase I Discovery

The following facts are taken primarily from the parties' Local Rule 56(a) statements and are undisputed unless otherwise noted.

### A.  Patient Care Reports (PCRs) and the MEDS software

Fabula was employed as an Emergency Medical Technician ("EMT") with Defendant AMR, an ambulance service provider, from 2010 through the end of 2011. Local Rule 56(a)(1) Statement ("56(a)(1) Stmt.")., ECF No. 151 ¶ 3. Fabula's responsibilities included transporting patients as a member of an ambulance crew and documenting those transports by completing Patient Care Reports ("PCRs"). *Id.* ¶ 4.

Each ambulance transport or "run" included a crew of two EMTs or one paramedic and one EMT. *Id.* ¶ 10. One crew member drove the ambulance, and the other provided patient care. *Id.* ¶ 11. The crew member providing care was responsible for completing a PCR using AMR's proprietary system called the Multi-EMS Data System ("MEDS"). *Id.* ¶¶ 11, 14. Crew members

completed PCRs on MEDS by answering a series of questions on dropdown menus and filling in narratives in free form text boxes. *Id.* ¶¶ 13, 15. PCRs included information such as patient demographics, medical condition, treatment provided, and the time and location of the run. *Id.* ¶¶ 12–13.

One specific piece of information contained in each PCR was whether crew members performed an Advanced Life Support ("ALS") Assessment and whether they performed ALS-level services. *Id.* ¶ 16. Medicare regulations define an ALS assessment as "an assessment performed by an ALS crew as part of an emergency response that was necessary because the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment. An ALS assessment does not necessarily result in a determination that the patient requires an ALS level of service." 42 C.F.R. § 414.605. Fabula alleges that AMR instructed crew members to enter on the PCR that an ALS Assessment had been performed any time a paramedic was on the crew. 56(a)(1) Stmt., ECF No. 151 ¶ 16. AMR disputes this allegation and contends that the ALS Assessment section was not automatically populated in PCR reports and that the section could only be completed by a crew member. *Id.*

When a crew member completed a PCR, he or she submitted it electronically to AMR's MEDS server. *Id.* ¶¶ 19–20. AMR asserts that PCRs that were submitted could no longer be altered in any way, including by the crew members who submitted them. *Id.* (citing MEDS 2 Manual, ECF No. 146-48 at 5). Crew members could provide additional or corrected information only by completing an addendum, a separate document that was electronically attached to the original PCR. 56(a)(1) Stmt., ECF No. 151 ¶¶ 22, 30.

Fabula contends that the MEDS system changed while he was employed by AMR. Fabula Decl., ECF No. 153 ¶ 15.[1] The "MEDS 2" system was in place when he joined the company and for the "bulk of [his] time at AMR." *Id.* Using the MEDS 2 system, Fabula states that crew members could supplement or correct PCRs and resubmit them after the initial submission. *Id.* He asserts that AMR subsequently transitioned to "MEDS 3," and, under the new system, PCRs were locked to editing after they were submitted. *Id.* Fabula also states that crew members could "park" PCRs and edit them later before submitting them to the MEDS server. *Id.* ¶ 8. AMR disputes Fabula's recollection. It cites portions of the MEDS 2 manual indicating that PCRs cannot be altered once they are finalized. MEDS 2 Manual, ECF No. 146-48 at 5 ("Once the PCR is locked, you can only preview or transmit the PCR. If additional information needs to be added to the PCR, an Addendum must be completed.").

**B. Physician Certification Statements (PCSs)**

AMR documents state that a Physician Certification Statement ("PCS") "is required when we transport a Medicare patient in a non-emergency situation where the patient is under the direct care of a physician." ECF No. 152-9 at 17. The documents also state that the PCS "supports the medical reason why an ambulance was the correct level of transportation" and was

---

[1] When first asked at his deposition whether PCRs could be revised after submission to the MEDS server, Fabula testified that PCRs could not be altered. Fabula Dep., ECF No. 145-1 at 31 ("Q: . . . [Y]ou could never change the original PCR that had been submitted; is that correct? A: Not to my recollection. Q: Meaning that you're agreeing with me? A: I'm agreeing with you. Q: Okay. So the original PCR was locked down, and after that you could be asked, or you could choose to make an addendum? A: As far as I remember. I remember times needing to be corrected. I just don't remember the process."). On cross-examination in the deposition, though, he stated that the program changed while he worked at AMR and suggested that it was once possible to edit PCRs without completing an addenda. Fabula Dep., ECF No. 152-1 at 21 ("Q: . . . . Are you saying that you would be able to open up the original PCR and add additional information to the narrative? A: At some points we were. Then we had to move through the addendum. The time I was at AMR, the electronic PCR changed several times.").

"reasonable and necessary." *Id.* at 16. Information on the PCS regarding a patient's medical condition "must be completed by the physician or authorized clinician," which includes registered nurses and nurse practitioners. *Id.* at 26-28. For the transport of "repetitive patients"— patients requiring "three or more ambulance transports during a 10-day period OR one transport per week for a minimum of three weeks for treatment of the same condition"—Medicare requires a PCS signed by a physician (not another authorized clinician) and obtained *before* the ambulance transport is provided. *Id.* at 23-24. "Once signed, however, a repetitive patient PCS can be used for 60 days when the patient is transported for the same condition." *Id.*; *see also* 42 C.F.R. § 410.40(d)(2).

### C. AMR's Billing Procedures

After a crew member completed and submitted a PCR, MEDS automatically forwarded it to the Transportation Authorization Department ("TAD"). 56(a)(1) Stmt., ECF No. 151 ¶ 26. TAD reviewed each PCR, and if it identified any issues, sent notes with clarifying questions or requests for addenda to the crew member who completed it. *Id.* ¶ 27. Fabula contends that another department, Patient Business Services ("PBS"), also regularly reviewed PCRs and provided comments and questions for TAD to pass on to crew members. 56(a)(2) Stmt., ECF No. 151 ¶ 2. When a crew member received a question or comment from TAD or PBS, he or she could create an addendum to provide additional or corrected information. 56(a)(1) Stmt., ECF No. 151 ¶ 29. AMR asserts that crew members who received a request for clarification or additional information but who could not recall the underlying run were permitted to complete an addendum stating that "no further medical necessity" or "no further information" could be provided. *Id*. Fabula testified that his supervisors told him he could not indicate he did not remember the patient, and that he "need[ed] to put something in there." Fabula Dep., ECF

No.152-1 at 46. He acknowledged that he was told by field training officers that he could write "no further medical necessity" if he did not recall additional information about a patient. Fabula Dep., ECF No. 145-1 at 32.

Once the internal review of a PCR was complete, PBS determined if the run was billable and to whom. 56(a)(1) Stmt., ECF No. 151 ¶ 45. If it determined a run was billable, PBS submitted a claim for reimbursement. *Id*. PBS prepared bills for Medicare and Medicaid, as well as private payors and direct bills to patients. *Id*. ¶ 47. In some instances, AMR billed Medicare even though it knew the claim would be denied so that it could seek payment from a secondary payor such as the patient's private insurance. *Id*. ¶¶ 49–50. In these cases, it sometimes used "denial modifiers." *Id*. ¶¶ 49, 51. "The GY denial modifier notified CMS that the run was not medically necessary based on the documentation." *Id*. ¶ 51. "The GZ modifier notified CMS that AMR was unsure whether the runs were medically necessary and left the ultimate assessment up to CMS." *Id*. Fabula states that AMR could and did appeal the denial of claims that were submitted using GY and GZ modifiers. 56(a)(2) Stmt., ECF No. 151 ¶ 31; Adams Expert Report, ECF No. 145-13 at 15. Fabula also asserts that, on at least one occasion, Medicare paid a claim that AMR submitted with a GZ modifier without the need to appeal. 56(a)(2) Stmt., ECF No. 151 ¶ 33; Adams Expert Report, ECF No. 145-13 at 15.

### D.  Ambulance Runs Identified in the Complaint

The Fourth Amended Complaint identifies several specific ambulance runs or sets of runs that Fabula contends were falsified at AMR's direction or otherwise improperly billed to Medicare. Fourth Am. Compl. (FAC), ECF No. 105 ¶¶ 88–94, 99, 100. Phase I discovery with respect to Fabula's FCA claims was limited to these specific runs. *See* Discovery Ruling, ECF No. 138 (discussing the scope of Phase I discovery as limited to the "specific claims and

ambulance runs identified in the operative Complaint").[2] I summarize the allegations in the complaint and the evidence developed with respect to each of these runs (the "Complaint Ambulance Runs") below, organized according to the paragraph in the Fourth Amended Complaint that addressed them.[3]

### 1. *Paragraph 88: December 16, 2011 Run*

#### a) *Allegations in the Fourth Amended Complaint*

Fabula alleged that, on December 16, 2011, AMR dispatcher Paul Zadrozny contacted him to ask whether he wanted to work on a long-distance patient transfer from New Haven, CT, to Guilford, CT. FAC, ECF No. 105 ¶ 88. Zadrozny told Fabula that he would be required to complete paperwork to ensure that Medicare would reimburse AMR for the transfer. *Id*. AMR allegedly "wanted" Fabula to write that the patient could not sit at a 90-degree angle due to a hip fracture, even though "the patient had already fully recovered." *Id*.

---

[2] Phase I also included Fabula's retaliation claim and the defense of judicial estoppel. I address the retaliation claim separately below. AMR did not address the issue of judicial estoppel in its motion for summary judgment.

The September 12, 2018 discovery ruling, ECF No. 138, and the parties' briefs on this motion for summary judgment use the phrase "Subject Transports" to describe the specific ambulance runs alleged in the Fourth Amended Complaint. I do not use that term in this ruling because there is some dispute regarding its scope. *See* Reply Mem. to Rule 56(d) Mot., ECF No. 176 at 4–6; *see also* discussion of Fabula's Rule 56(d) Motion *infra* Section VI. Instead, I use the term "Complaint Ambulance Runs" to refer to "the specific claims and ambulance runs identified in the operative Complaint."

[3] Paragraphs 76–77 of the Fourth Amended Complaint describe a specific ambulance run for which an AMR hospital liaison named Nancy found a note in the patient's hospital record about a violent incident three years before and wrote in the PCR, "Today, the patient is violent." FAC, ECF No. 105 ¶¶ 76–77. In addition, Paragraph 97 describes a specific ambulance run for which Fabula obtained information about a patient's hip fracture from years before and listed it on the PCR as if it were recent. FAC, ECF No. 105 ¶ 97. The complaint does not allege the dates on which these incidents occurred, and the parties have not treated them as Complaint Ambulance Runs in their briefing.

### b) *Facts Developed in Phase I Discovery*

AMR asserts that it was unable to identify any records matching this description. Supplemental Responses to Relator's First Set of Interrogatories ("Supplemental Responses"), ECF No. 145-10 at 3–4. Nor was it able to find potentially relevant records using expanded search criteria. *Id.*

### 2. *Paragraphs 89 and 90: December 14, 2011 Runs*

### a) *Allegations in the Fourth Amended Complaint*

Fabula alleged that he was partnered with paramedic Amy Baitch for two runs on December 14, 2011. Fourth Amended Complaint, ECF No. 105 ¶ 89. Both runs were routine scheduled patient transports, and neither patient required an ambulance. *Id.* ¶¶ 89–90. AMR falsely dispatched the ambulance as a "911" call so that it could bill Medicare for the transports. *Id.*

### b) *Facts Developed in Phase I Discovery*

AMR represents that it was unable to identify any PCRs matching these calls. Supplemental Responses, ECF No. 145-10 at 4. It reports that it identified only one date in 2011 (August 11, 2011) on which Fabula was partnered with Amy Baitch, and the pair submitted only one PCR designated as a 911 call, which involved a patient who had been in a car accident. *Id.*

### 3. *Paragraph 91: December 7, 2011 Run*

### a) *Allegations in the Fourth Amended Complaint*

Fabula alleged that he was suspended for one day on December 7, 2011, for failing to complete three "parked" PCRs for ambulance runs in May. FAC, ECF No. 105 ¶ 91. AMR allegedly provided him with information to include in the forms and would not allow him to return from suspension unless he completed them. *Id.*

*b) Facts Developed in Phase I Discovery*

AMR asserts that it does not have record of any "parked" PCRs from the relevant days. AMR produced an "Employee Suspension Notice" dated December 3, 2011 notifying Fabula that he would be suspended for one day on Monday, December 5, 2011 for "parked PCR issues" in violation of AMR's standard operating procedures. ECF No. 146-44. The notice indicates the "Infraction Date" was November 30, 2011, and states that Fabula had received warnings on May 22, 2011 and October 5, 2011. *Id.*

### 4. Paragraphs 92 and 99: Patient JC Runs[4]

*a) Allegations in the Fourth Amended Complaint*

Fabula alleged that he was involved in several runs for patient JC, a "grossly overweight man" with diabetes. FAC, ECF No. 105 ¶¶ 92, 99. JC allegedly called 911 for an ambulance six dozen times in 2011. *Id.* ¶ 99. AMR directed Fabula to "change and falsely certify the electronic entry of" PCRs indicating that "[JC] had difficulty remaining in an upright position in order to qualify [JC]'s runs in the ambulance for Medicare/Medicaid reimbursement." *Id.* The Fourth Amended Complaint describes a specific ambulance run for JC on December 4, 2011. *Id.* ¶ 92. That day, Fabula was allegedly partnered with EMT Douglass Gladstone. *Id.* Gladstone and Fabula assisted in transporting JC to a hospital. The patient had no medical need to go to the hospital, "he simply wanted to go there." *Id.* AMR directed Fabula to list JC's prior surgeries to justify the transport even though the patient was "able to walk himself to the stretcher[] and climb on unassisted." *Id.*

---

[4] Fabula identified this individual as "CD" in the Fourth Amended Complaint. AMR identifies this patient as "JC" in its motion for summary judgment. I use the designation from the summary judgment briefing.

AMR produced 71 PCRs for patient JC from 2011.[5] Of those, six included addenda. *See* ECF Nos. 146-11 through 146-16. Fabula authored two of the 71 PCRs that AMR produced. Fabula Decl., ECF No. 153 ¶ 51. He was not a crew member on any of the calls with addenda. *See* ECF Nos. 146-11 through 146-16. He asserts, however, that AMR has failed to produce all of the relevant records for JC. Fabula Decl., ECF No. 153 ¶¶ 50–53. AMR's submissions suggest that it transported patient JC on 133 occasions in 2011. *See* Billing Summary, ECF No. 146-21 at 2, 5, 8, 11 (billing summary spreadsheet listing 133 separate transport dates for JC; *see also* Adams Expert Report, ECF No. 145-13 at 17 n. 9 ("It is also worth noting that AMR transported Patient JC 133 times in 2011."). The summary sheet shows that 71 of the 133 total transports were submitted for reimbursement to Medicare, Medicaid, or both. Billing Summary, ECF No. 146-21 at 3, 6, 9, 12 (columns H and I listing the payor to whom each claim was submitted).

Fabula asserts that AMR improperly billed Medicare for 23 of JC's transports. *See* Berry Expert Report, ECF No. 154 at 8–9 (explaining that 25 runs for JC were improperly billed); ECF No. 150 at 21 n.15 (noting that Fabula's expert later agreed that two of those runs were properly billed). He cites the report of Peter Berry, whom he has disclosed as a billing expert. Mr. Berry

---

[5] There are discrepancies in the record as to how many PCRs AMR produced for patient JC and another repetitive patient, WP (discussed in further detail below). Neither party has included the full set of PCRs in the summary judgment record. AMR notes that it produced 150 PCRs in total for patient JC and patient WP. 56(a)(1) Stmt., ECF No. 151 ¶ 36. AMR does not discuss how many PCRs it produced for each. Fabula's billing expert states that he reviewed 71 PCRs for patient JC and 79 PCRs for patient WP. Berry Expert Report, ECF No. 154 at 9, 11. His summary sheet for patient WP includes only 78 entries. *Id.* at 14. Fabula is inconsistent in his brief as to the number of PCRs that AMR produced for both patients. *See* ECF No. 150 at 16, (listing "72 runs pertaining to patient 'JC'"); *id.* at 21 (noting that AMR "produced 71 runs pertaining to ambulance transports for JC"); *id.* 22 (section titled "Patient WP: 78 Medically Unnecessary Transports"); *id.* at 23 (noting that "AMR has only produced a limited set of 79 PCRs for WP ambulance runs . . . .").

explains that he determined that AMR billed for Advanced Life Support ("ALS") services when runs were initiated by 911 calls. Berry Expert Report, ECF No. 154 at 9. The PCRs for JC's runs do not include documentation of an ALS assessment or intervention, and Mr. Berry asserts that the fact that the runs were initiated by 911 calls does not, on its own, support billing at the ALS level. *Id.* Fabula asserts that AMR trained crew members to indicate that an ALS assessment was conducted any time a paramedic was on the run, even if the paramedic did not actually complete an assessment. Fabula Decl., ECF No. 153 ¶¶ 42–44. He also asserts that MEDS 2 required crew members to report that an ALS assessment had been performed any time a paramedic was on the run regardless of whether the assessment was actually performed. *Id.* ("[F]or a certain period of time beginning with the roll-out of the new documentation protocol, the PCR software was set up such that you could not move past the dispatch section without having checked yes [indicating an ALS assessment was performed] if a paramedic was on the run."). AMR's billing expert agrees that "10 transports for Patient JC met medical necessity for ambulance transport but do not appear to meet the standard for ALS billing, although BLS billing would have been appropriate." Adams Expert Report, ECF No. 145-13 at 21.

### 5. *Paragraph 93: October 17, 2011 Run*

#### a) *Allegations in the Fourth Amended Complaint*

Fabula alleged that he transported a patient from a nursing home to a health center on October 17, 2011. FAC, ECF No. 105 ¶ 93. The transport was cancelled en route to the health center because the crew was informed that the patient did not have an appointment that day. *Id.* The patient never left the ambulance. *Id.* AMR nevertheless directed Fabula to complete two PCRs as if the crew had transported the patient to and from the appointment. *Id.* Fabula's

supervisor also directed him to have the nurse at the nursing home "sign twice," thereby

"trick[ing her] into signing as though she was receiving the patient at the health center." *Id.*

        *b)*  *Facts Developed in Phase I Discovery*

AMR identified two PCRs that matched the description in the Fourth Amended

Complaint. The first PCR indicates the crew arrived at the patient's side at 8:53 AM on October

17, departed for the health center at 9:22 AM, and arrived there at 9:52 AM. ECF No. 146-3 at 2.

The "Narrative" section states

> pt transferred from [redacted] to [redacted] for a ct scan. pt needs ambulance due to
> severe bed sore on buttocks and need for o2 for copd. Pt had no complaints during
> transport and vitals remained within normal limits. upon arrival to facility for pts ct scan
> this facility stated they have no record of this pt having an appointment today, and they
> cannot take this pt at this time. The facility from which the patient is from booked the
> ambulance for this transport but did not make the appointment for the ct scan. The pt
> never left the ambulance and did not make contact with the ct scan facility. Pt was
> transported back to the original facility where pt care was transferred over to staff.

*Id.* at 3. The "Facility Signature" section includes a signature from "melissa," as the "Receiving

Facility Representative." *Id.* at 6. The name and location of the facility are redacted. *Id.*

The second PCR indicates the crew was at the patient's side at 9:53 AM, they departed

for the nursing home at 9:52 AM, and arrived at 10:46 AM. ECF No. 146-4 at 2. The "Narrative"

section states:

> pt transferred to [redacted] from [redacted]. Pt needs ambulance due to severe bed sore
> on buttocks and need for o2 for copd. Pt had no complaints during transport and vitals
> remained within normal limits. Pt was transported back to original facility where pt care
> was transferred over to staff.

*Id.* The "Facility Signature" section includes a signature from "melissa" as the "Receiving

Facility Representative," and the name and location of the facility are again redacted. *Id.* at 6.

AMR submitted bills to Medicaid for both October 17, 2011 ambulance runs, and both

bills were paid. *See* AMR Payment Records, ECF No. 152-7 at 64–65 (AMR records showing

Medicaid payment of $218.82 for each run).[6] Fabula contends that these bills were fraudulent because AMR should have billed Medicaid for only one run. 56(a)(2) Stmt., ECF No. 151 ¶¶ 12–14.) AMR contends that it was appropriate to submit two bills under Medicaid billing rules. *See* Reply Br., ECF No. 165 at 8.

### 6. *Paragraph 94: July 7, 2011 Runs*

#### a) *Allegations in the Fourth Amended Complaint*

Fabula alleged that he was partnered with paramedic William Schick for "several 911 calls" on July 7, 2011 "for patients that did not actually require an ambulance." FAC, ECF No. 105 ¶ 94. On July 22, 2011, Fabula was given four of the PCRs from his July 7 shift and "told he had to write in previous surgeries and injuries to justify their need for transport." *Id.* One PCR was for a woman who thought she could "skip the line" at the hospital if she arrived in an ambulance. *Id.* Another PCR was for a man who called an ambulance because he did not want to buy his own cough syrup. *Id.*

#### b) *Facts Developed in Phase I Discovery*

AMR identified six PCRs for runs completed by Fabula and William Schick. ECF Nos. 146-5 through 146-10. None of the PCRs include addenda. Three of the runs were scheduled transports and were not initiated by 911 calls. *See* ECF Nos. 146-5 at 2; 146-6 at 2; 146-9 at 2. Three of the runs were initiated by 911 calls. *See* ECF No. 146-7 at 2; 146-8 at 2; 146-10 at 2. The first 911 call involved a woman who fell at home and injured her elbow. ECF No. 146-7 at 3. The second call came from a man who reported that his doctor told him to call 911 to be

---

[6] Both runs were also billed to *Medicare* but included a "GY" modifier and were not paid. Adams Rebuttal Report, ECF No. 145-13 at 21–22; AMR Payment Records, ECF No. 152-7 at 64–65 (payment records for October 17 runs showing $0.00 paid by Medicare). Fabula does not contend that AMR submitted these claims to *Medicare* inappropriately.

transported to the hospital to have his knee drained. ECF No. 146-8 at 3. He had a note from his doctor to that effect. *Id.* The third involved a woman who reported abdominal pain and stated that she was vomiting blood. ECF No. 146-10 at 3. Fabula has not explained whether or how these PCRs match up to the allegation in the complaint or how they were falsified.

### 7. *Paragraph 100:  Patient WP[7]Runs*

#### a) *Allegations in the Fourth Amended Complaint*

Fabula alleged that AMR transported patient WP for dialysis "6 trips a week." FAC, ECF No. 105 ¶ 100. At first, WP could not stand and walk, but recovered "after a short period of time" and was able walk and sit up on a stretcher. *Id.* AMR transported him to dialysis by ambulance "three times each week all summer long in 2011." *Id.*

#### b) *Facts Developed in Phase I Discovery*

AMR produced 79 PCRs for WP from the summer of 2011. Fabula was not a crew member on any of those runs. *See* Fabula Decl., ECF No. 153 ¶ 47. Three of the PCRs include addenda. ECF Nos. 146-17 at 4; 146-18 at 9; 146-19 at 3. Two of the PCRs state that the patient had difficulty sitting upright due to weakness, and the addenda add that the patient was unable to sit for long periods due to postural hypotension. ECF Nos. 146-17 at 3, 4; 146-19 at 3. The third PCR does not suggest that the patient had difficulty sitting, but the addendum states that the patient would be "at risk during transport in a wheelchair" because he is a "stroke pt w/ weakness no trunk control." ECF No. 146-18 at 3, 9.

Fabula's billing expert, Peter Berry, opines that all 79 of WP's transports were improperly billed to Medicare. Berry Expert Report, ECF No. 154 at 11. First, he states that the

---

[7] The Fourth Amended Complaint refers to this patient as "E." I use the initials from the parties' briefs on summary judgment.

Medicare Policy Manual requires the ambulance service provider to obtain a Physician Certification Statement ("PCS") for repetitive transports, and AMR did not have a valid PCS for a "majority of the claims" for patient WP. *Id*. at 10. Second, Mr. Berry reviewed "site surveys" completed by AMR for patient WP, two of which stated that WP could "sit in a wheelchair" while one stated that he was "bed confined." *Id.* Berry opines that a patient is not "bed confined" within the meaning of the Medicare Policy Manual if he can be transported in a wheelchair. *Id.* Third, Mr. Berry explains that the PCRs for WP "share some of the same contradictory statements on the issue of bed confined." *Id.* He also notes that the PCRs did not include certain information, such as the patient's vital signs or results of a physical exam, and the crew members "failed to paint the picture of the patient's need for an ambulance." *Id.*[8]

AMR contends that it had valid PCSs for all of WP's runs in the summer of 2011, and that it was entitled to rely on the physician's certification to establish the medical necessity of those transports. Reply Br., ECF No. 165 at 9; Physician Certification Statements, ECF Nos. 146-30 at 2; 146-31 at 2; 146-32 at 2. The earliest PCS is dated, in handwriting, "May 23, 2010." ECF No. 146-32 at 2. Fabula contends that AMR cannot rely on this document because it was signed "more than a year before any of the WP transports at issue." Opp'n Br., ECF No. 150 at 40. Thus, AMR had no PCS for WP's transports in June 2011. 56(a)(2) Stmt., ECF No. 151 ¶ 42. AMR argues that the date on the PCS was a simple clerical error, and the actual certification date

---

[8] Berry indicates that the mileage for some of the transports was too high and the patient did not sign the PCR in some instances. *See* Berry Expert Report, ECF No. 154 at 14. It is undisputed that AMR had a valid lifetime signature for patient WP, and Berry conceded that it was proper for AMR to rely on that signature for the runs with missing signatures. *See* Berry Dep., ECF No. 145-3 at 13, 27. In his opposition to the motion for summary judgment, Fabula has not relied on Berry's observation about the transport mileage as a basis for concluding that AMR submitted a false claim.

was May 23, 2011. The typewritten date printed on the top of the form—apparently a facsimile line—is May 23, 2011. ECF No. 146-32 at 2.

AMR's billing expert, Margaret Adams, agrees that 15 of the 79 PCRs for WP did not meet Medicare's medical necessity standard. Adams Expert Report, ECF No. 145-13 at 14–15. She explains that, of the 15 problematic PCRs she identified, nine were submitted with GY modifiers and one was submitted with a GZ modifier. *Id.* Medicare initially denied all claims submitted with GY modifiers, but AMR appealed and received payment for five of them. *Id.* Medicare paid the only claim submitted with a GZ modifier. Explanation of Benefits for Run No. 10621641, ECF No. 152-10 at 8.

Fabula asserts that AMR has not produced all of the relevant PCRs for WP. He explains that he was a crew member on approximately 10 transports for WP in 2010 and 2011, but AMR has not produced any PCRs for runs on which he worked. Fabula Decl., ECF No. 153 ¶ 47. He specifically states that an AMR supervisor directed him to falsify a PCR for a run with WP in May or June 2011. *Id.* AMR has not produced the PCR for that run. Fabula also attaches an email between two of his superiors at AMR from October 2010 in which the pair discuss a paramedic's refusing to provide an addendum documenting a dialysis patient's postural hypotension. Martus Email, ECF No. 153 at 20–21. The email notes that Fabula worked on the run. *Id.* at 20.

### E. Retaliation Claim

On December 4, 2011, Fabula was paired with paramedic Kevin Bodiford for his shift. 56(a)(1) Stmt., ECF No. 151 ¶ 62. AMR asserts that neither Fabula nor Bodiford created a PCR

for one of their runs that day. *Id.* ¶ 63.[9] Fabula contends that Bodiford did create a PCR for the run in question, but AMR returned it to Bodiford to revise and he refused. Fabula Decl., ECF No. 153 ¶ 57 ("The PCR for the run had originally been drafted by Bodiford, and the run form had been 'kicked back' to Bodiford to revise in December 2011.")  On December 25, 2011, Fabula went on Medical leave. 56(a)(1) Stmt., ECF No. 151 ¶ 65.

Russell Pierson, an Operations Manager at AMR, emailed Fabula while he was on leave about coming in to complete a "missing pcr." Pierson Email, ECF No. 152-4 at 78. Fabula explained he was on leave and stated that he remembered the run "vaguely." *Id.* at 76–77. Pierson indicated that he "had the patient information. [he] just need[ed] the pcr recreated for billing purposes." *Id.* at 76. Fabula agreed to try to recreate the form, and Pierson stated he would leave the information that Fabula would need at Operations. *Id.* On February 23, 2012, Fabula emailed Pierson stating that he "s[p]ent about 45 minutes going over every detail of the 2 run forms waiting for [him] in operations" but he didn't "remember either call and [he] would have no idea what to write . . . ." *Id.* at 75. Pierson replied, stating that the PCR "need[ed] to be recreated for billing purposes." *Id.* He explained that the forms he had left for Fabula were "for information purposes only," and acknowledged Fabula might not remember the patient's vitals, "but other than that the pcr can be completed." *Id.* Fabula noted that it was "more th[a]n vitals." *Id.* He explained that did not "remember the patient or the patient[']s condition," and he "wouldn[']t be able to write a narrative that was accurate." *Id.*

---

[9] As Fabula points out, the deposition excerpt that AMR cites does not appear to support this proposition. *See* Fabula Dep., ECF No. 145-1 at 46–47 ("Q: So Mr. Dingus was telling you all they want you to do is to put it in – put down the demographics so that AMR could get this off their books; is that correct? A: Yes. Q: You didn't choose to do that; is that correct? A: Correct.").

Fabula states that Pierson and the supervisor on duty the evening of February 23, 2012 instructed him to recreate the December run by copying information verbatim from a run for the same patient from February 22, 2012. Fabula Decl., ECF No. 153 ¶ 63. Fabula states that he told Pierson by phone or in person that he "was not comfortable with completing a PCR" for the December run and "that [he] did not believe what [he] was being asked to do by AMR was legal." (Fabula Declaration, ECF No. 153 ¶ 67.) AMR contends that Fabula did not take issue with the legality of AMR's request until after he was placed on administrative leave. 56(a)(1) Stmt., ECF No. 151 ¶ 73. AMR placed Fabula on administrative leave on March 1, 2012. *Id.* ¶ 72. Fabula states that Pierson told him he could not return until he completed the PCR. Fabula Decl., ECF No. 153 ¶ 69.

On April 29, 2012, Fabula sent Pierson an email inquiring about his status with the company. ECF No. 146-36 at 2–3. He noted his understanding that he "was expected to come in and recreate 2 PCR's for billing purposes." *Id.* He explained the he was "uncomfortable with what [Pierson was] asking [him] to do" because he "couldn't accurately remember how that run took place . . . ." *Id.* He also stated that, while he was happy to do his "part as long as it is in a way that falls within AMR corporate guidelines," he was "worried that what [he was] being asked to do [did] not." *Id.* at 3. Brian Dingus, Fabula's union representative, sent Fabula an email at 4:18 PM the same day, stating:

> I had thought we had put this to bed and when you were ready we were going to go down to AMR and square things away. They just need form created for billing purposes. If you do not remember anything about the call then you don't have to write anything about the call. They have the info that you were on the call and all they want from you at this point is to get it off their books by recreating the demographics.

ECF No. 146-36 at 4. The following day, Pierson replied to Fabula's email, stating, "Mr. Dingus has spoken to me regarding this issue and has been briefed on what needs to be done. . . ." *Id.* at

2. Fabula continued to refuse to recreate the PCR, explaining that he did not "feel what [Pierson was] asking [him] to do is within the Guidelines of AMR corporate Policy." Fabula Email, ECF No. 146-38 at 2.

## IV.   Legal Standards

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id*. at 657 (quotation marks omitted). On summary judgment a court "must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017).

## V.     Discussion

AMR asserts that it is entitled to summary judgment on all claims. I address Fabula's

FCA claim and retaliation claim in turn.

### A.  FCA Claim

The FCA imposes liability on "any person" who "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment" to the federal government, or who

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a

false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). A person acts "knowingly" under the

FCA if the person (1) has "actual knowledge of the information;" (2) "acts in deliberate

ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth

or falsity of the information." *Id.* § 3729(b)(1)(A). "The FCA may be enforced not just through

litigation brought by the Government itself, but also through civil *qui tam* actions that are filed

by private parties, called relators, in the name of the Government." *Kellogg Brown & Root*

*Servs., Inc. v. U.S., ex rel. Carter*, 135 S. Ct. 1970, 1973 (2015) (quotation marks omitted).

Fabula's Fourth Amended Complaint, construed liberally, specifically pleads four

theories of FCA liability by linking the theories to the Complaint Ambulance Runs.[10] First, he

---

[10] Fabula asserts additional theories of liability in the Fourth Amended Complaint that do not
relate to the Complaint Ambulance Runs. *See* Opp'n Br., ECF No. 150 at 11 (citing allegations
in the Fourth Amended Complaint regarding AMR's training of ambulance personnel to include
key words in PCRs and AMR's use of its dispatch center to provide telephonic instructions to
EMTs in the field on how to fill out the PCR). The Fourth Amended Complaint does not provide
any examples of these schemes in connection with specific ambulance runs or specific claims
submitted to Medicare, and the facts developed during Phase I discovery do not support them.
*See, e.g.*, 56(a)(2) Stmt., ECF No. 151 at ¶ 6 (alleging that "[c]aregivers were instructed by AMR
to call dispatch . . . to obtain past medical history," but not citing any specific ambulance runs or
claims submitted to Medicare involving such conduct).

The Second Circuit approved Fabula's pleadings specifically because he "alleg[ed] with
particularity AMR's scheme to falsify PCRs" and "identif[ied] particular cases in which that

alleges that AMR directed Fabula and other crew members to revise or recreate PCRs after they were submitted to add false or misleading information to establish that runs were medically necessary and to obtain reimbursement from Medicare. *See* FAC, ECF No. 105 ¶¶ 23–47. Second, he alleges that AMR fraudulently obtained nurses' signatures on supporting forms that were submitted to Medicare along with the PCRs. *Id.* ¶¶ 48, 80, 93. Third, Fabula alleges that AMR submitted PCRs to Medicare that falsely reported an Advanced Life Support ("ALS") assessment or ALS services, even when none had been performed. *Id.* ¶¶ 132–38.[11] Finally, Fabula alleges that AMR's software required a designation of "bed confined" on all PCRs, "irrespective of the actual physical condition of the patient" and even if other documentation "indicated that the patient was not bed confined." *Id.* ¶ 139.[12] I will address each of these theories as it relates to the specific claims and ambulance runs (the Complaint Ambulance Runs) identified in the Fourth Amended Complaint.

scheme was carried out." *Chorches*, 865 F.3d at 87. Recognizing the need for "prudential and proportionate" discovery, the Second Circuit recommended—and this Court adopted—the bifurcated approach to discovery in this case, focusing only on the Complaint Ambulance Runs identified in the Fourth Amended Complaint. The Circuit noted that "[i]f no genuine dispute of material fact is found to exist as to whether false claims were in fact submitted in that limited set of cases, the lawsuit would be at or near its end. *Chorches*, 865 F.3d at 88 n.13 ("Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations."). Therefore, because Fabula has neither alleged nor provided any evidence for specific ambulance runs or claims submitted to Medicare in connection with these other theories, summary judgment with respect to these allegations is granted.

[11] Although this third theory is not explicitly linked to a Complaint Ambulance Run in the Fourth Amended Complaint, the evidence developed during Phase I discovery concerning the Complaint Ambulance Runs does provide some support for it, as discussed below.

[12] Similarly, this fourth theory is not explicitly linked to a Complaint Ambulance Run in the Fourth Amended Complaint. However, as discussed below, there is some evidence developed during Phase I discovery related to patient WP that AMR may have incorrectly billed for some runs as "bed confined."

## 1. *False Revisions or Addenda to PCRs*

The predominant theory of liability in the Fourth Amended Complaint is that AMR directed Fabula and other crew members to revise or recreate PCRs after they were submitted to add false or misleading information to establish that runs were medically necessary, a requirement for reimbursement by Medicare. *See* FAC, ECF No. 105 ¶¶ 23–47 (describing AMR's alleged scheme). It carried out its scheme by providing crew members with handwritten notes with the requisite changes to each PCR, which it then collected and shredded once the changes were made. *Id.* ¶¶ 25–27. It is this theory that the Second Circuit analyzed in reviewing Fabula's claims. *See Chorches*, 865 F.3d at 76 ("The [complaint] alleges that during the period of Fabula's employment, AMR routinely made its EMTs and paramedics revise or recreate their field-generated PCRs to include false statements purportedly demonstrating medical necessity to ensure that runs would be reimbursable by Medicare, whether or not ambulance service was in fact medically necessary in the particular case."). As Fabula notes in his opposition to summary judgment, "[t]he use of a *post hoc* addendum to establish medical necessity where none previously existed goes to the very heart of relator's claims in this action." ECF No. 150 at 27.

AMR argues that Fabula's PCR-falsification theory fails because he cannot adduce evidence that he or other crew members revised PCRs after submission. Specifically, AMR points to portions of the MEDS software manual indicating that the MEDS software prevents any editing once a PCR is finalized. MEDS 2 Manual, ECF No. 146-48 at 5 ("Once the PCR is locked, you can only preview or transmit the PCR. If additional information needs to be added to the PCR, an Addendum must be completed."). In his deposition, Fabula initially confirmed that PCRs could not be altered once submitted, but later testified that the system changed while he worked at AMR and that, before the change, one could modify the original PCRs. Fabula Dep.,

ECF No. 152-1 at 21 ("Q: . . . Are you saying that you would be able to open up the original PCR and add additional information to the narrative? A: At some points we were. Then we had to move through the addendum. The time I was at AMR, the electronic PCR changed several times."). He affirmed the latter assertion in a declaration submitted along with his opposition to the motion for summary judgment. *See* Fabula Decl., ECF No. 153 ¶ 15.[13] AMR asserts that Fabula's "[s]wearing something that is technically impossible does not create a genuine dispute." AMR Br., ECF No. 144-1 at 23.

Ultimately, I need not decide whether there is a genuine dispute about whether PCRs *could* be changed after submission. Fabula has adduced no evidence that any PCR that he completed concerning a Complaint Ambulance Run *actually was* modified to include false or misleading information and submitted to Medicare or Medicaid for payment. AMR identified 221 PCRs for the Complaint Ambulance Runs identified in the Fourth Amended Complaint. *See* 56(a)(1) Stmt., ECF No. 151 ¶ 38.[14] Fabula has not identified a single PCR that he completed that includes an addendum. Nor has he identified any PCR that he completed that contains false

---

[13] Fabula also argues that PCRs could be "parked"—*i.e.*, saved on the crew member's laptop and edited and submitted later. AMR asserts that only the PCR's original author could view its contents while it was parked. Boyd Suppl. Aff., ECF No. 165-1 ¶ 3.

[14] Fabula now suggests that AMR has not produced all of the PCRs for Complaint Ambulance Runs. Fabula Decl., ECF No. 153 ¶¶ 47; 50–53. But he failed to raise these alleged deficiencies in AMR's production during Phase I discovery, despite taking issue with AMR's responses to other requests. *See generally* Ruling on Discovery Dispute, ECF No. 138. He offers no explanation for failing to do so. Nor does he cite evidence to support his suggestion that AMR performed an incomplete search for PCRs related to the Complaint Ambulance Runs or that it is withholding such PCRs. Nothing prevented Fabula from developing such evidence in Phase I discovery; he could have, for example, deposed the person responsible for conducting the search. Finally, as I discuss below in addressing Fabula's Rule 56(d) motion, I will not infer that the additional PCRs Fabula says exist would support this FCA theory when the hundreds of PCRs that AMR produced do not.

or misleading information of the sort alleged in the complaint. Fabula authored two of the PCRs that AMR produced for patient JC. *See* ECF No. 152-9 at 2–7 (PCR for Case No. 10658350), 8–13 (PCR for Case No. 10735642). The narrative sections for both PCRs plainly state that the patient did not have any medical need for ambulance transport. *E.g.*, *id.* at 3 ("Pt seems like he just needs someone to talk to. Pt has no medical complaint, no dizziness, nausea. No complaint at all. Pt was transported to HSR because he called 911 and requested transport NO FURTHER MEDICAL NEC[E]SSITY."); *id.* at 9 ("Pt does not appear to have a medical complaint and just wants a ride to the hospital."). One of the runs was billed to private payors and was not submitted to Medicare or Medicaid. *See* Billing Summary, ECF No. 146-21 at 2–3 (showing that case number 10658350 was billed to "PRIVATE PAY"). The second was submitted to Medicare with a GY modifier. *Id.* at 2–4 (showing that case number 10735642 was billed to "MEDICARE" with a "GY" modifier code); *see also* 56(a)(1) Stmt., ECF No. 151 ¶ 51 ("The GY denial modifier notifie[s] CMS that the run was not medically necessary based on the documentation.").[15] AMR's billing expert explains that Medicare denied the claim, and AMR did not appeal or receive payment from any government payor. *See* Adams Expert Report, ECF No. 145-13 at 21, 37; 56(a)(1) Stmt., ECF No. 151 at ¶ 37 (Fabula admits that Case No. 10735642 was "submitted to the Government but not paid according to AMR."). Fabula does not argue that AMR directed him to revise either PCR, nor does he assert that either formed the basis of a false claim.

---

[15] The Fifth Circuit has held that a provider cannot be liable under the FCA for submitting a claim with a GY modifier because, in using the modifier, the provider "discloses that the services were not reimbursable." *Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't of Health & Human Servs.*, 455 F.3d 500, 507 (5th Cir. 2006) ("[A] physician who disclosed to the government that the services were not reimbursable could not be said to have *knowingly* submitted a false claim.").

Fabula identifies two PCRs for patient WP with addenda, authored by other AMR employees, that he contends are consistent with his overarching theory of *post hoc* PCR-falsification. 56(a)(2) Stmt., ECF No. 151 ¶ 37. The PCRs detail ambulance runs on June 20, 2011 (Case No. 10630499) and July 13, 2011 (Case No. 10659578). *Id.* Both state that the patient could not sit up during transport due to weakness. ECF No. 146-17 at 3; ECF No. 152-5 at 15. The first includes a one-line addendum, dated July 7, 2011, stating, "pt can[']t [sit] for long per[io]ds of time pt has postural hypoten[s]ion." ECF No. 146-17 at 4. The second includes a similar addendum, dated July 20, 2011, stating the patient is "[u]nable to sit for [a] long period due to postural hypoten[s]ion." ECF No. 152-5 at 15. Fabula also submits an email from a TAD supervisor to New Haven Operations acknowledging that she had written a note on a PCR cover sheet for one patient reading, "Med Nec=Pt unable to sit upright for long periods of time due to postural hypotension." ECF No. 152-5 at 29.

Fabula asserts that the foregoing evidence demonstrates "the type of false billing practices alleged in the [Fourth Amended Complaint]." ECF No. 150 at 27. I disagree. Fabula does not cite any evidence supporting an inference that the addenda regarding postural hypotension are false or misleading. He states, without citation, that the "physical assessments and vitals reflected in those billings do not support that WP was suffering from postural hypotension during those ambulance runs . . . ." Opp'n Br., ECF No. 150 at 24. Fabula's expert noted only that, for two *different* PCRs for different runs, there was no "documentation describing hypotension or instability of any kind." ECF No. 154 at 10.[16] The absence of

<hr/>

[16] Fabula's expert offered this opinion for case numbers 10645070 (dated July 1, 2011) and 10606322 (dated June 1, 2011). ECF No. 154 at 10. The PCRs that Fabula claims included false addenda are case numbers 10630499 (dated June 20, 2011) and 10659578 (dated July 13, 2011). ECF Nos. 146-17 at 2, 152-5 at 14.

documentation for two other runs does not suggest that the PCRs at issue are false. Further, Fabula was not involved with the runs he has identified and has offered no evidence that patient WP did not actually suffer from postural hypotension. Indeed, AMR has produced a physician certification statement dated July 28, 2011 indicating that patient WP required ambulance services due to postural hypotension. ECF No. 146-31.[17]

Overall, Fabula has not adduced evidence from which a reasonable factfinder could conclude that AMR directed its employees to revise or recreate PCRs to include false or misleading information. The motion for summary judgment is therefore GRANTED with respect to this theory of FCA liability.

### 2. *False Certifications from Physicians and Nurses*

The Fourth Amended Complaint also alleges that AMR submitted false supporting documentation to Medicare, in addition to the false PCR forms. FAC, ECF No. 105 at ¶¶ 48, 80, 93. Fabula's Fourth Amended Complaint makes general allegations regarding AMR's practices for submitting PCS forms that were not truly prepared by a physician or other authorized clinician, as required by Medicare regulations.[18] He also alleges the submission of a specific fraudulent signature in connection with the October 17, 2011 transport. *See supra* Section

---

[17] The parties debate in their briefs about whether PCSs such as this one were adequate under Medicare rules and/or whether they negate the element of scienter. I need not resolve that debate. I cite the PCS here only to emphasize that Fabula has offered no evidence that statements in the addenda that patient WP suffered from postural hypotension were false.

[18] Fabula alleges that "AMR employee[s] at the hospital filled out the PCS forms for the nurses, and then led the nurses to believe they were signing a form solely for AMR's record-keeping," FAC, ECF No. 105 at ¶ 48, that "[m]ost of the nurses signed the PCS forms without reading them," *id.*, that AMR employees "instructed the nurse on what needed to be written in the PCS," *id.*, and that at least one nurse "[r]egularly . . . left a signed PCR on the desk with no information filled out" for AMR employees to complete, *id.* at ¶ 80. The Fourth Amended Complaint does not identify any specific ambulance runs or claims related to these allegations in Paragraphs 48 and 80.

III.D.5. This scheduled transport from a nursing home to a health center was cancelled en route, such that the patient never left the ambulance and was driven directly back to the nursing home. ECF No. 146-3 at 3. The Fourth Amended Complaint alleges that, on that transport, Fabula's supervisor directed him to have the nurse at the nursing home "sign twice," thereby "trick[ing her] into signing as though she was receiving the patient at the health center." FAC, ECF No. 105 at ¶ 93. The facts developed in discovery show that AMR did bill Medicaid for two ambulance runs on October 17, 2011, even though the patient never left the ambulance. ECF No. 146-3 at 3; ECF No. 152-7 at 64-65.

AMR does not contest the basic facts regarding this October 17, 2011 transport or the fact that it billed Medicaid for two ambulance runs for the patient. AMR does contend, however, that this October 17, 2011 Complaint Ambulance Run was appropriately billed under Medicaid regulations and therefore cannot be considered false under the FCA. AMR Br., ECF No. 144-1 at 27-28, 28 n.16. AMR's expert, Maggie Adams, testified in her deposition that "billing to Medicaid was proper for these two claims" because "the nonemergency transport broker . . . obtained authorization for these trips [which] was applied to the trips when they were billed." Adams Dep., ECF. No. 145-9 at 5. Adams was unable to cite the relevant Medicaid regulation at her deposition, but AMR's Reply Brief points to Chapter 7 of the "Connecticut Medical Transportation Services Policy/Regulation," Reply Br., ECF No. 165 at 8, which corresponds to the Regulations of Connecticut State Agencies § 17-134d-33. Under this regulation, "[t]ransportation may be paid only for trips to or from a medical provider for the purpose of obtaining medical services covered by Medicaid." Conn. Agencies Regs. § 17-134d-33(e)(1)(C). And while "[t]he Department shall not pay for cancelled calls for any type of transportation," *id.* at § 17-134d-33(i)(9)(C), the regulation defines a "cancelled call" as "notification to the

transportation provider not to provide services to a recipient, *prior to the time* the vehicle is enroute [sic] to the pickup point." *Id.* at § 17-134d-33(b)(13) (emphasis added). Based on this regulation and Adams's opinion, AMR argues that the October 17, 2011 transport was "properly billed to and paid by Medicaid as non-emergency transport for a patient being transported to/from medical services after a transportation broker obtained authorization from Medicaid for coverage of these trips." AMR Br., ECF No. 144-1 at 28; Adams Dep., ECF No. 145-9 at 5.

Fabula, on the other hand, argues the record shows that AMR falsely billed Medicaid twice for a single transport. Opp'n Br., ECF No. 150 at 30. I find that Fabula has at least raised a genuine dispute of fact on this issue and deny summary judgment as to the October 17, 2011 transport.

First, the October 17 transport contained a factually false statement. As the Fourth Amended Complaint alleges, one nurse ("melissa") signed two PCRs related to this transport. ECF No. 146-3 at 6 (PCR for case number 10776513); ECF No. 146-4 at 6 (PCR for case number 10779934).[19] The first PCR indicates that the patient was transported from a "SNF" location to a "Clinic/Office" destination, ECF No. 146-3 at 2, while the second PCR indicates that the patient was transported from a "Clinic/Office" location to a "SNF" destination, ECF No. 146-4 at 2. But as Fabula alleged and as the narrative section of the first PCR confirms, the "pt never left the ambulance and did not make contact with the ct scan facility." ECF No. 146-3 at 3. The same Registered Nurse ("melissa") signed both PCRs, which certify that "[t]he above named patient, as described by AMR, was received by our facility, which provided care or assistance to

---

[19] AMR argues that the two forms "show different signatures," AMR Resp. to Additional Material Facts, ECF No. 170 at 7, but Fabula has shown at least a genuine dispute on this point. The printed name is "melissa" on both forms; whether the handwritten signatures match is a question of fact. ECF No. 146-3 at 6; ECF No. 146-4 at 6.

the patient, on the date and time set forth above." This evidence supports Fabula's argument that the PCR for case number 10776513 contained a false certification that the "Clinic/Office" facility "received [and] provided care or assistance to the patient." ECF No. 146-3. AMR has not disputed the materiality of this facility signature or the company's knowledge that the signature was false; it argues only that the October 17, 2011 transport was appropriately billed.

Second, AMR has not shown that it is entitled to judgment as a matter of law on this transport since the regulations it cites do not conclusively establish that the transport was properly billed as two trips rather than one. "A claim may be false for purposes of the FCA if it is made in contravention of a statute, regulation, or contract." *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014); *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016) (recognizing an implied false certification theory of FCA liability, noting that "[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided"). Conversely, compliance with regulations typically establishes that the submission of claims is not false or fraudulent. *Thulin*, 771 F.3d at 1000 (affirming dismissal of complaint where alleged conduct did not violate any statute or regulation as alleged); *United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 608 (8th Cir. 1992) (finding defendant did not submit false claim where Medicare's rules and regulations permitted its conduct); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1075 (9th Cir. 1998) (finding no falsity when defendants' conduct conformed with government guidelines).

Here, however, AMR has not shown that its compliance is beyond dispute. Under the cited regulations, AMR is correct that the October 17, 2011 transport would not meet the

definition of a "cancelled call." Nonetheless, other provisions of the regulation contemplate that some transports could be billed as a "round trip." *See* Conn. Agencies Regs. § 17-134d-33(b)(35) (defining "round trip" as "the dispatching of a vehicle to the recipient(s) pickup point, transporting the recipient(s) to a medical provider and transporting the recipient(s) back to the pick-up point"); *see also* § 17-134d-33(i)(9)(E)(i) (noting that for a round trip, "[o]ne base rate and waiting time may be paid," but "the Department shall not pay for two base rates and waiting time"). This section of regulation does not explain when a trip such as the October 17, 2011 transport should be billed as a round trip and when it should be billed as two separate trips, and AMR does not cite any other authority for its argument that the transport was properly billed. The parties' experts also disagree on the propriety of billing this transport as two trips. Fabula's expert, Peter Berry, opines—albeit without citing any Medicaid regulations—that the October 17, 2011 transport "should have been billed as one transport," since the ambulance crew did not remove the patient from the ambulance and did not actually deliver the patient to a covered destination. Berry Expert Report, ECF No. 154 at 11. AMR's expert, Maggie Adams, argues that the billing was proper, but she does not cite any regulation or provide any support for her contention that a state "nonemergency transport broker" obtained authorization from Medicaid for coverage of these trips. AMR Br., ECF No. 144-1 at 28; Adams Dep., ECF No. 145-9 at 5. AMR has therefore not met its burden, since there is a genuine dispute as to falsity regarding the October 17, 2011 transport.

### 3. *Improper Billing for ALS Assessments and Services*

Fabula also alleges that AMR falsely billed Medicare by billing runs at the ALS level without an adequate basis. In the Fourth Amended Complaint, he alleges generally that AMR

required a "paramedic assessment" or an ALS assessment[20] to be indicated on every PCR. FAC, ECF. No. 105 at ¶¶ 132–33. Even for patients who had no need for ALS services, he claims, an ALS assessment would be indicated automatically on the PCR whenever a paramedic was present on the ambulance run. *Id.* ¶¶ 137–38. He also alleges that by indicating on the PCR that an ALS assessment had been performed, AMR could bill Medicare for an additional $1,200. *Id.* ¶¶ 134, 136, 138.

AMR argues that the coding of ambulance runs at the ALS level is a "new theory" for Fabula—one not included in any of his pleadings. AMR Br., ECF No. 144-1 at 32–33, 40; *see also* ECF No. 168 at 13 & n.4. AMR also disputes Fabula's allegations that the ALS assessment section of a PCR was automatically filled in, claiming instead that "[a] provider had to document whether an ALS assessment was completed when completing the PCR in the MEDS software." 56(a) Stmt., ECF No. 151 ¶ 16. Finally, AMR argues, to the extent some runs were incorrectly billed at the ALS level, "[t]here is no evidence that AMR knowingly upcoded these runs." AMR Br., ECF No. 144-1 at 40-41.

Although it is a close call, I disagree with AMR's contention that upcoding ambulance runs to an ALS level is a "new theory." AMR is correct that Courts need not consider a plaintiff's unpled claims that were raised for the first time in opposition to summary judgment. *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010). But Fabula's Fourth Amended Complaint does allege, at least generally, that AMR billed Medicare for ALS Assessments even when none had been performed. FAC, ECF No. 105 ¶¶ 132–38. The facts developed during Phase I of discovery provide support for this allegation, indicating that some

---

[20] Paragraphs 132–38 of the Fourth Amended Complaint seem to refer to "paramedic assessment[s]" and ALS assessments interchangeably. I use the term "ALS assessment" for consistency.

Complaint Ambulance Runs were incorrectly billed at the ALS level, including some relating to patient "JC." *See generally* Berry Decl., ECF No. 154 at 8–9.[21] While Fabula's Fourth Amended Complaint does not specifically connect his allegations regarding ALS assessments to his allegations regarding patient JC, the complaint does assert that AMR billed the government incorrectly for patient JC. FAC, ECF No. 105 ¶ 99 (alleging that AMR transported JC "six dozen times during 2011" and that false PCRs "were submitted by AMR to Medicare for payment"). Although the specific flaws alleged about the transports of JC were not the ALS assessments, AMR was on notice both as to the general theory of improper upcoding of ALS assessments, FAC, ECF No. 105 ¶¶ 132–38, and that the specific transports of JC identified in the Fourth Amended Complaint were under scrutiny for alleged improper billing.

I also find that genuine disputes of material fact exist as to whether AMR submitted false claims by seeking reimbursement for ALS assessments or services that were not provided. The evidence produced relating to the Complaint Ambulance Runs of patient JC is sufficient to create such a dispute. AMR produced 71 PCRs for patient JC from 2011. *See supra* Section III.D.4. AMR's expert, Maggie Adams, admits that at least ten of these PCRs were improperly billed at the ALS level. Adams Expert Report, ECF No. 145-13 at 21 (finding that "10 transports for Patient JC . . . do not appear to meet the standard for ALS billing" because they were

---

[21] AMR also argues that the theory concerning ALS assessments Fabula presses in his summary judgment papers differs from the one asserted in the Fourth Amended Complaint because the former involved AMR's instruction to crew members to select "yes" on the PCR while the latter involved the computer's automatic default to that choice. Reply Br., ECF No. 165 at 13–14. The survival of this theory, however, does not turn on such minute detail about the means of the alleged fraud. The Fourth Amended Complaint placed AMR on notice that it was being charged with deliberately upcoding ALS assessments. Whether the evidence developed during discovery suggests that the intentional upcoding was entirely automated or partially manual does not matter.

"dispatched BLS [basic life support] based on the patient's reported condition" or because "no ALS assessment was performed").

AMR does not dispute its expert's findings that these claims were incorrectly billed but argues that Fabula has not offered any evidence of scienter with regards to these claims. Reply Br., ECF No. 165 at 14. I disagree. Fabula avers in his declaration that he was "instructed by Boyd that whenever a paramedic was on the ambulance run, we were required to check yes indicating that an ALS Assessment was performed – whether or not an ALS Assessment had actually been performed. We were told by Boyd to do this in order to increase billing and billing revenue." Fabula Decl., ECF. No. 153 ¶ 42; *see United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 457 (S.D.N.Y. 2017) ("[C]ompeting declarations" can suffice to create genuine disputes of material fact as to intent.). Fabula authored two of the PCRs produced with respect to JC: for runs on July 12, 2011 (Case No. 10658350) and September 11, 2011 (Case No. 10735642). Although the September 11, 2011 PCR indicates "no" next to ALS assessment, ECF No. 152-9 at 8, the July 12, 2011 PCR indicates "yes," *id.* at 2. To be sure, as noted above, the July 12, 2011 run was not ultimately billed to Medicare, ECF No. 146-21 at 2–3, and the PCR expressly notes the lack of medical necessity, ECF No. 152-9 at 3. Nonetheless, the PCR provides evidence about a Complaint Ambulance Run that corroborates Fabula's sworn statement that it was AMR's practice to instruct crews to "check yes indicating that an ALS Assessment was performed" even when no such assessment was done. Fabula Decl., ECF No. 153 ¶ 42. Indeed, the PCR makes clear that, although JC had called 911, it was obvious from the outset that he did not need an ambulance, let alone an ALS assessment: the PCR states that when the ambulance arrived, JC was "standing outside waiting for transport to HSR [Hospital of St. Raphael]," and that he "is a very lonely man who needs attention," "has no medical complaint, no dizziness,

nausea," and "[n]o complaint at all." ECF No. 152-9 at 3. The ALS box is nonetheless checked "yes," consistent with Fabula's statement about AMR's practice. *Id.* at 2. Further corroboration of this practice comes from the testimony of Jeffrey Boyd, who testified that AMR billed for an ALS assessment even if no physical assessment was performed. Boyd Dep., ECF No. 152-3 at 26 (stating that if a "paramedic determines that a physical assessment is not necessary and that is part of his overall assessment of the patient . . . that would be considered as an ALS assessment" and would be marked as such on the PCR). When the Phase I evidence is construed in the light most favorable to Fabula, it is sufficient to create a genuine dispute as to whether AMR directed crew members to report that an ALS assessment was conducted regardless of whether it was actually performed and thus had knowledge of false claims being submitted to Medicare. Therefore, I deny summary judgment as to this specific theory of FCA liability.

### 4. *Transports of Patient WP*

In his Fourth Amended Complaint, Fabula makes an allegation of fraud in connection with specific transports of patient WP in Summer 2011. FAC, ECF No. 105 ¶ 100. The complaint asserts that WP received "6 trips a week" in an ambulance for regular dialysis appointments during the summer of 2011, but "after a short period of time, he was able to walk and to sit up on a stretcher," and the patient "himself even questioned why he was being transported by ambulance for dialysis." *Id.* Based on this allegation, the transports of WP were considered to be "Complaint Ambulance Runs," and AMR produced documents relating to 79 transports of patient WP in June, July, and August 2011. In his summary judgment papers, Fabula argues that AMR submitted false addenda to WP's PCRs to establish medical necessity, Fabula Decl., ECF No. 153 ¶ 47–49, and he presents the testimony of his two experts, Edward Dickinson and Peter Berry, to argue that many of WP's PCRs (a) lacked appropriate

documentation of vital signs and physical assessments, (b) were not supported by a valid, signed PCS, or (c) lacked appropriate documentation to support the designation of the patient as "bed-confined." Opp'n Br., ECF No. 150 at 23–24; 56(a)(2) Stmt., ECF No. 151 ¶¶ 21–27. AMR's expert, Maggie Adams, agrees that some of the ambulance runs for patient WP did not meet requirements of medical necessity. Opp'n Br., ECF No. 150 at 25; 56(a)(2) Stmt., ECF No. 151 ¶¶ 30–31. I grant summary judgment with respect to patient WP and each of these theories of FCA liability asserted in Fabula's opposition to summary judgment.

### a) False Addenda for WP Transports

As discussed above, Fabula has not produced evidence to support that any specific PCRs for patient WP—or any other patient—were actually false. Therefore, I grant summary judgment on this claim.

### b) Inadequate Documentation of Vital Signs, Physical Assessments, and PCS Forms

This theory of improper billing based on inadequate documentation, suggested by Fabula's experts, was not alleged in Fabula's Fourth Amended Complaint—in connection with patient WP or even generally. Fabula's opposition to summary judgment only confirms this point: he highlights four aspects of AMR's "multi-faceted" fraudulent scheme that were alleged in the Fourth Amended Complaint but does not mention inadequate documentation as a theory of liability. Opp'n Br., ECF No. 150 at 11. In *Lyman v. CSX Transportation, Inc.*, the Second Circuit affirmed the district court's decision not to consider "plaintiff's new theories of liability" raised for the first time in opposition to summary judgment. 364 Fed. App'x 699, 702 (2d Cir. 2010). In that case, plaintiff alleged generally in his complaint that defendant "negligently, recklessly and carelessly failed to provide plaintiff with a reasonably safe place to work," and made some specific allegations of failure to inspect and failure to warn. *Id.* at 701. Plaintiff then

made additional specific arguments for the first time at summary judgment about the set-up and lighting of the workplace. *Id.* The court held that the general allegation of negligence in the complaint was "insufficient to put defendant on notice of plaintiff's new negligence claims," and therefore should not be considered. *Id.* tat 701–02.

Here, too, Fabula's general allegation in the Fourth Amended Complaint that AMR billed Medicare for medically unnecessary ambulance runs is not sufficient to put AMR on notice of specific theories regarding documentation of vital signs and physical assessments or the lack of PCS forms. Indeed, as AMR points out, these new theories of inadequate documentation are the reverse of the theories of affirmative misstatements and creation of false documents pled in the Fourth Amended Complaint. The predominant theory in the complaint is that Fabula and his co-workers were directed to add false revisions to PCRs they had previously prepared; such blatant fraud is a far cry from omitting information about patients' vital signs. Similarly, the Complaint's only allegation about PCSs is that AMR tricked nurses into signing them, FAC, ECF No. 105 ¶ 48, which is very different from not having enough of them.

The complaint's passing reference to AMR's "submitting false claims for reimbursement that it knew were not reimbursable under the rules and regulations governing payments by Medicare," *id.* ¶ 14, is not sufficient to put AMR on notice of these new theories of inadequate documentation, especially since the complaint does make specific allegations about violations of some particular Medicare rules, *e.g.*, *id.* ¶¶ 132–38 (discussing improper billing for ALS assessments). Given the volume and complexity of Medicare and Medicaid billing rules, *see Escobar*, 136 S. Ct. at 2002 (recognizing that "billing parties are often subject to thousands of complex statutory and regulatory provisions"), I will not treat Fabula's generalized allegation of rule violations as requiring AMR to prepare to defend against *all* species of alleged billing rule

violations, even when the set of facts is limited to the Complaint Ambulance Runs. If it were otherwise, there would be no need to plead factual allegations at all—let alone to plead them with the specificity required by Rule 9(b)—as to any theory of fraud in a Medicare billing case. The plaintiff could simply point to a group of cases, like the Complaint Ambulance Runs, and assert that somewhere in each of those cases lies a violation of a Medicare rule. That is not the notice pleading contemplated by the Federal Rules, especially in a fraud case.

Because Fabula did not plead any of the elements of FCA liability with respect to these new theories of inadequate documentation, I will not consider them.

### c) Improper Designations as "Bed Confined"

The complaint does make a brief allegation about misuse of the term "bed confined," which creates a presumption that a run is eligible for Medicare reimbursement. *See* Medicare Benefit Policy Manual, ECF No. 152-8 at 48–49.[22] In a single paragraph of the Fourth Amended Complaint, Fabula alleges that AMR's software program automatically inserted "Yes" next to that term "on the electronic claims form, irrespective of the actual physical condition of the patient, even though information contained on the providers' own run reports indicated that the patient was not bed confined." FAC, ECF No. 105 ¶ 139. This allegation is somewhat unclear (it is not clear whether the "electronic claims form" is the same as the electronic PCR) and

---

[22] Section 10.2.3 of the Medicare Benefit Policy Manual states:
> [M]edical necessity is established when the patient's condition is such that the use of any other method of transportation is contraindicated. Contractors may presume this requirement is met . . . when the beneficiary was bed-confined before and after the ambulance trip. . . . A beneficiary is bed-confined if he/she is:
> - Unable to get up from bed without assistance;
> - Unable to ambulate; and
> - Unable to sit in a chair or wheelchair.
>
> . . . Bed-confinement, by itself, is neither sufficient nor is it necessary to determine the coverage for Medicare ambulance benefits."

ECF No. 152-8 at 48–49.

contradictory (the same paragraph of the Fourth Amended Complaint states both that the "new software program . . . automatically insert[ed] a 'Yes'" next to the term "bed confined" and that "the computer program would not autofill in 'bed confined'"). *Id.* Nonetheless, when construed liberally, this paragraph suggests AMR intentionally set up its software automatically to upcode all patients as "bed confined." Though there is no reference to the "bed confined" designation in the complaint's discussion of patient WP, this theory of intentional upcoding is arguably pled in general terms.

In his summary judgment papers, Fabula now presents the report of expert Peter Berry, who opines that the documentation for WP (particularly the site surveys and PCRs) "fail[s] to support the need for medically necessary transport under Medicare," in part because statements in WP's documentation "support the fact the patient wasn't bed confined at the time of service." Berry Expert Report, ECF No. 154 at 10–11. Berry states that "[s]everal PCR's" indicate that WP was not, in fact, "bed confined at the time of service." Based on this issue and the lack of other documentation, he argues that AMR "fail[ed] to support the need for medically necessary transport under Medicare." *Id.* Fabula asserts that Berry's report shows a material factual dispute regarding the transports of WP. Opp'n Br., ECF No. 150 at 26.

Though Fabula arguably pled intentional upcoding to a "bed confined" designation in his Fourth Amended Complaint, the evidence developed during Phase I discovery does not fit well with the theory he alleged. The complaint suggests that AMR's software either automatically inserted a "Yes" next to the "bed confined" data field or required that the field be checked "yes" before the PCR could be submitted. FAC, ECF No. 105 ¶ 139. But, as AMR explained, "[t]here is no 'bed confined' field on a PCR in the relevant versions of MEDS. There is a field for 'unable to travel by wheelchair' for which EMTs and paramedics may select yes or no." AMR

Response No. 2 to Relator's Second Set of Interrogatories, ECF No. 159 at 28; *see also, e.g.*, ECF No. 166-4 at 17 (PCR for the transport of WP on August 31, 2011, case no. 10721169, showing a field "Unable to Travel by Wheelchair" as a possible "Reason for Transport"); ECF No. 146-17 (same for transport of WP on June 20, 2011, case no. 10630499). The PCRs for patient WP produced in discovery do not support the theory that the "unable to travel by wheelchair" field was automatically filled in or required to be filled in before submission: in many PCRs for WP, the field is either marked "N/A," *e.g.*, ECF No. 146-17 at 4; ECF No. 166-4 at 9, 12, 14, 38, 48, 60, 77, 98, or left blank, *e.g.*, ECF No. 166-4 at 5, 17, 56; ECF No. 146-28 at 4. The dispute between the parties' experts regarding the sufficiency of AMR's documentation, including whether WP could properly be classified as "bed confined" under Medicare rules, is quite different from the systematic upcoding Fabula briefly alleges in the complaint, and the evidence concerning the Complaint Ambulance Runs does not substantiate the deliberate theory of software-driven fraud Fabula alleged.

Even if I could construe the allegations about the "bed confined" designation to embrace the occasional documentation flaws cited by Fabula's expert, I would still grant summary judgment on this issue. Fabula has presented no evidence that AMR *knowingly* submitted any claims without proper documentation that a patient was "bed confined" by Medicare's definition. His declaration provides only general assertions, without any specific examples, that AMR instructed him and other crew members to indicate that patients were "Unable to Travel by Wheelchair" when completing PCRs in the first instance. *See* Fabula Decl., ECF No. 153 ¶ 18 (asserting that for patients who were in fact able to travel by wheelchair, Fabula "and other caregivers were required to include . . . in PCRs that those patients had unsteady gait and were not able to stand or walk on their own . . . and were not able to travel by wheelchair"); *id.* ¶ 19

(making similar assertions that Fabula "and other caregivers were required to include . . . the prior hip surgery" for patients who had since recovered and to include "that the patient had a history of falls – or was a fall risk because of certain conditions" when that patient was no longer a fall risk). These statements are insufficient for two reasons. First, he sets forth no facts showing that he has personal knowledge regarding any such instructions AMR might have provided to other crew members. Second, as shown, he was not himself a crew member on any of the transports reflected in the 79 PCRs for the Complaint Ambulance Runs relating to WP. Thus, these general assertions do not raise a genuine dispute about scienter with respect to any Complaint Ambulance Runs relating to WP. And Fabula offers no other evidence that AMR knowingly submitted claims for any of the Complaint Ambulance Runs that included false statements about whether a patient was "bed confined." The sole specific transport of WP relating to the "bed confined" issue that he discusses in his declaration is new, does not relate to a Complaint Ambulance Run, was not the subject of his expert's opinions, and involved instructions to amend a PCR, rather than a designation as "bed confined" or "unable to travel by wheelchair" forced by the software in the first instance. *See id.* ¶ 49. Allowing this untested, new averment into the case at this point would be akin to allowing Fabula to amend his complaint and would defeat the purpose of confining discovery to the Complaint Ambulance Runs—a point I discuss further below in addressing Fabula's Rule 56(d) motion.

Therefore, even if Paragraph 139 of the Fourth Amended Complaint is construed so broadly as to include the argument that AMR lacked adequate documentation to support designations of patients as "bed confined," the evidence produced during Phase I discovery does not allow any reasonable inference that AMR knowingly submitted false claims to Medicare. Because there is no support in the record for any of the theories actually alleged in the Fourth

Amended Complaint with respect to WP, I grant summary judgment as to each of these theories and as to each of the Complaint Ambulance Runs relating to patient WP.

## B. Retaliation Claim

In addition to his FCA claims under 31 U.S.C. § 3729(a)(1)–(2), Fabula also states a retaliation claim under 31 U.S.C. § 3730(h). This provision of the FCA gives employees a right of action if they are "discharged, demoted, suspended . . . or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." § 3730(h)(1). As the Second Circuit noted in its ruling in this case, "[a]lthough this Court has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h), district courts in this Circuit, as well as our sister circuits, have generally required a plaintiff to show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *Chorches*, 865 F.3d at 95 (internal citations and quotation marks omitted); *see also Dhaliwal v. Salix Pharmaceuticals, Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (adopting the three-prong approach used in *Chorches*).

In support of its motion for summary judgment on this claim, AMR argues "[t]here is no evidence that Fabula engaged in protected conduct," since his "refusal to complete the December 4 PCR did not prevent a FCA violation." AMR Br., ECF No. 144-1 at 47 (arguing that Fabula "could have completed the demographic information and written 'I don't remember' in the PCR's narrative section," which would have "fulfilled his employment obligations" and still prevented the December 4 run from being reimbursed). AMR also contends that it "was not aware that Fabula was allegedly engaged in protected activity when he was placed on

administrative leave," *id.* at 48, and did not "kn[o]w that Fabula's refusal to complete a PCR for the December 4 Run was to prevent a FCA violation," Reply Br., ECF No. 165 at 16. AMR asserts that it was not properly "on notice" because Fabula "never indicated his refusal was because he believed the run was not medically necessary, not properly billable, or was an FCA violation." Reply Br., ECF No. 165 at 17. Because it was unaware of the protected activity, AMR argues, it could not have taken adverse action against him "because of" any protected activity. AMR Br., ECF No. 144-1 at 48. AMR's position is that "Fabula was placed on administrative leave and ultimately terminated for failing to do his job." *Id.*

Fabula disputes that he could have "fulfilled his employment obligations" by writing "I don't remember" on the PCR, arguing instead that AMR's intent was to "require Fabula to recreate a *billable* PCR"—one that Medicare would reimburse. Opp'n Br., ECF No. 150 at 47–48. He also contends that AMR was aware as early as February 2012 that he was "specifically concerned about being asked to perform a task [] he considered illegal." *Id.* at 48. I find that the evidence presented is sufficient to establish a factual dispute as to each of the three elements of his retaliation claim.

### 1. Protected Activity

First, the Second Circuit held in its decision remanding this case that "refusal to engage in the fraudulent scheme, which . . . was intended and reasonably could be expected to prevent the submission of a false claim to the government, can constitute protected activity under the statute." *Chorches*, 865 F.3d at 96. The FCA's anti-retaliation provision "broadly protects efforts to stop even a single violation of the FCA." *Id.* at 98. Fabula has adduced evidence to support his allegation that he intended and reasonably expected to prevent the submission of a false claim by refusing to recreate the December 4 PCR. Operations Supervisor Russell Pierson stated three

times in February 2012 emails to Fabula that he needed the December 4 PCR "recreated for billing purposes." Pierson Email, ECF No. 152-4 at 75–76, 78. Pierson's March 20, 2012 letter to Fabula also states, "This unbillable run form constitutes not only a liability to you and the company, but also lost revenue." Pierson Letter, ECF No. 152-4 at 84. Fabula's February 23, 2012 email states he "wouldn't be able to write a narrative that was accurate." *Id.* at 75. This correspondence supports Fabula's allegations that he was concerned about creating a false PCR that he reasonably expected would be submitted for reimbursement. Fabula also attests that he told Pierson by phone or in person that he "was not comfortable with completing a PCR" for the December run and "that [he] did not believe what [he] was being asked to do by AMR was legal," and that he called the Medicare hotline around the same time. Fabula Decl., ECF No. 153 ¶¶ 67–68.

Fabula disputes AMR's contention that he could have satisfied Pierson and other supervisors by writing "I don't remember," pointing to the emails with Pierson insisting on a PCR "for billing purposes," and alleging that other supervisors instructed him to copy a narrative from a previous run "verbatim" on the December 4 PCR. Fabula Dep., ECF No. 152-1 at 57–58. Pierson stated in his deposition that while AMR procedure permitted crew members to write on a PCR that they did not remember a call, he did not recall whether he or anyone else at AMR told Fabula of this option in February 2012. Pierson Dep., ECF No. 152-2 at 35-36. Based on this evidence, there is a genuine dispute as to Fabula's intent and reasonable expectations in refusing to recreate the December 4 PCR.

### 2. *Knowledge*

A genuine issue of fact also exists as to AMR's awareness that Fabula was engaged in protected activity. For a plaintiff to show that a defendant has knowledge of the protected

activity, "he must specifically tell the employer that he is concerned about possible fraud. Put another way, the plaintiff must do something to put the defendant on notice that his actions are in furtherance of an FCA action." *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, No. 3:14-CV-1223 (VLB), 2017 WL 2636037, at *11 (D. Conn. June 19, 2017) (dismissing plaintiff's retaliation claim "where there [we]re no specifics putting the Defendant on notice of actual fraud"); *see also Weslowski v. Zugibe*, 626 F. App'x 20, 22 (2d Cir. 2015) (dismissing a retaliation claim because plaintiff did not allege "that he did anything that would have put the [defendant] on notice that his refusal to approve the contract was in furtherance of an effort to stop a violation of the FCA").

The facts developed in discovery in this case distinguish it from both *Ameti* and *Weslowski*, since Fabula arguably did put AMR on notice that he was concerned about accuracy in a PCR that would be submitted for reimbursement. *See* Pierson Email, ECF No. 152-4 at 75 (Fabula emailed Pierson on February 23, 2012 that he "wouldn[']t be able to write a narrative that was accurate."); Fabula Declaration, ECF No. 153 ¶¶ 67–68 (stating that he told Pierson in person or on the phone in February 2012 that he "was not comfortable with completing a PCR" because he "did not believe what [he] was being asked to do by AMR was legal"). The Second Circuit noted in this case that, based on the facts alleged in the complaint, "Fabula's email and oral refusals to falsify the December 2011 PCR, and his statement to a supervisor . . . that he did not 'feel comfortable' making the alterations are functionally equivalent to raising the issue internally." *Chorches*, 865 F.3d at 98. Pierson testified that he understood, from Fabula's emails, that Fabula "was concerned about the legal implications of creating [the December 4 PCR]." Pierson Dep., ECF No. 152-2 at 45. Pierson's March 1, 2012 email to his supervisor, requesting permission to place Fabula on administrative leave, stated, "I don't believe [Fabula] has any

desire to provide a billable runform [sic]." Pierson Email, ECF No. 152-4 at 82. This evidence permits a reasonable inference that AMR knew, even before it placed him on administrative leave, that Fabula had concerns about the legality of creating an inaccurate PCR in order to make it billable.

### 3. Causation

The third element of a retaliation claim requires the plaintiff to show he was retaliated against "because of" his protected activity. § 3730(h)(1); *Chorches*, 865 F.3d at 95. The Second Circuit has not addressed whether plaintiffs alleging FCA retaliation claims must show but-for causation or only that the protected activity was a motivating factor in the company's decision to take adverse employment action. *Malanga v. New York University*, No. 14CV9681, 2018 WL 333831, at *3 (S.D.N.Y. Jan. 9, 2018). Other courts have recently adopted a but-for causation requirement in FCA retaliation cases based on the Supreme Court's interpretation of the phrase "because of"—which is used in the FCA anti-retaliation provision, 31 U.S.C. § 3730(h)(1)—in both Title VII and the ADEA to require but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 2517, 2529 (2013) (interpreting the "because of" phrase in Title VII to require but-for causation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009) (interpreting the "because of" phrase in the ADEA to require but-for causation); *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018) ("The District Court correctly applied Supreme Court case law when it instructed the jury using the 'but-for' causation standard for [plaintiff's] FCA retaliation claim."); *United States ex rel. King v. Solvay Pharm. Inc.*, 871 F.3d 318, 333 (5th Cir. 2017) (adopting a but-for causation requirement in FCA retaliation cases); *Malanga*, 2018 WL 333831, at *4.

Even under the stricter requirement of but-for causation, Fabula has demonstrated a genuine dispute of material fact that his protected activity was the but-for cause of his administrative leave and eventual termination. AMR admits that it placed Fabula on administrative leave "as a result of" his refusal to complete the December 4 PCR. 56(a)(1) Stmt., ECF No. 151 ¶ 72. The dispute between the parties centers on whether Fabula was placed on leave because he refused to complete "even a non-billable PCR" (such as by writing "I don't remember") or specifically because he would not complete a *billable* PCR. *Id.* As discussed above, Fabula has presented sufficient evidence to create a genuine dispute of material fact whether AMR would have accepted a non-billable PCR. *See, e.g.*, Pierson Email, ECF No. 152-4 at 75–76, 78 (noting that he needed the PCR "recreated for billing purposes"); Pierson Letter, ECF No. 152-4 at 84 (stating on March 20, 2012 that "This unbillable run form constitutes not only a liability to you and the company, but also lost revenue"); Fabula Dep., ECF No. 152-1 at 57–58 (alleging that other supervisors instructed him to copy a narrative from a previous run "verbatim" on the December 4 PCR). Because all three elements of Fabula's retaliation claim hinge on disputed questions of fact, I deny summary judgment as to this claim.

## VI.     Rule 56(d) Motion

In addition to opposing AMR's motion for summary judgment, Fabula in the alternative filed a motion under Fed. R. Civ. P. 56(d) to deny or defer consideration of AMR's motion pending completion of discovery necessary for Fabula's response. Fabula argues that "relator's ability to respond to [AMR's arguments regarding the lack of scienter] has been impeded by defendant's refusal to produce discovery materials sought by relator on this very issue." Rule 56(d) Mot., ECF No. 158 at 4. Fabula lists six specific discovery requests that he alleges can substantiate his allegations of false claims, *id.* at 4–5, and argues that he is "entitled to the above-

described discovery before the Court rules on defendant's motion [for summary judgment]," *id.* at 10. I deny his motion because I find that it fails to satisfy the requirements of Rule 56(d) and that granting the relief he requests would defeat the rationale of the "targeted discovery process" suggested by the Second Circuit, agreed to by the parties, and adopted in this case.

## A. Bifurcated Discovery

### 1. The Rationale

Following the Second Circuit's decision remanding this case, the parties jointly proposed bifurcating discovery, and I adopted the proposal. Scheduling Order, ECF No. 102. The idea to divide discovery into two phases originated in footnote 13 of the Second Circuit's decision, which is quoted above in Section II. *See Chorches*, 865 F.3d at 88 & n.13. That footnote responded to the Rule 9(b) concern—pressed by AMR on the appeal—that Fabula was making general allegations that gave him an "unjustified ticket to discovery." *Id.* at 87. Disagreeing that Fabula had made only general allegations, the court also noted that limiting discovery could allay the concern: "Fabula's plausible and particularized allegations are amenable to a targeted discovery process that could lead to a swift resolution of this lawsuit, especially if AMR has not committed the fraud alleged." *Id.* at 87-88. Such a "targeted discovery process," the court suggested, could prevent a plaintiff whose fraud claim lacked merit from imposing an expensive "fishing expedition" on a corporate defendant. The process would work by restricting discovery to the specific instances of false claims alleged—those that were sufficient to raise "a strong inference that specific false claims were submitted"—to test whether the evidence supported the assertion that "false claims were in fact submitted in that limited set of cases." *Id.* at 88 n.13. If it did not, "the lawsuit would be at or near its end." *Id.* If it did, however, "the door could be open to broader discovery without fear of subjecting an innocent defendant to burdensome and

unjustified inquiries," *i.e.*, phase II of the discovery process. *Id.* The court cited a decision by the Fifth Circuit, which similarly recognized that a "pointed and efficient" discovery process could help achieve the "the balance Rule 9(b) attempts to strike," noting that "tailor[ing]" discovery to fit "the complaint's particularized allegations" would "limit[] any 'fishing' to a small pond that is either stocked or dead." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009) ("Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations.").

Here, the "limited set of cases" the Second Circuit referred to consists of the Complaint Ambulance Runs, because those are the allegations that create a "strong inference that specific false claims were submitted." *Chorches*, 865 F.3d at 88 n.13. Once I adopted the parties' proposal, it was up to them to develop evidence about the Complaint Ambulance Runs during Phase I discovery showing whether or not "false claims were in fact submitted." Fabula in particular had to adduce evidence that, as a result of the fraudulent schemes described in the complaint, AMR made a false request for payment to a government payor in the cases described in the Complaint Ambulance Runs.

### 2. The Scope of Phase I Discovery

Phase I discovery was robust. The parties exchanged discovery for over fifteen months. Fabula produced documents, and AMR produced over 10,500 pages related to the Complaint Ambulance Runs and Fabula's retaliation claim. The parties collectively took nine depositions of six fact witnesses and three expert witnesses. Opp'n to Rule 56(d) Mot., ECF No. 168 at 9. The fruits of their labors fill the summary judgment entries on the docket, spanning 127 exhibits and thousands of pages. Although the process was limited to the Complaint Ambulance Runs, a great deal of information was exchanged.

The lodestar for policing the limits on this process was the Complaint Ambulance Runs: "the specific claims and ambulance runs identified in the operative Complaint." *See* Scheduling Order, ECF No. 102 at 1. This followed from the Second Court's holding in *Chorches*— approving Fabula's pleading specifically because he "alleg[ed] with particularity AMR's scheme to falsify PCRs" and "identif[ied] particular cases in which that scheme was carried out"—and the Circuit's suggestion that discovery could be limited initially to "the cases identified in the complaint." *Chorches*, 865 F.3d at 87, 88 n.13. For instance, the Fourth Amended Complaint alleges transports of patient JC on December 4, 2011 and "during 2011," FAC, ECF No. 105 ¶¶ 92, 99, and alleges transports of patient WP "all summer long in 2011," *id.* ¶ 100. Because these are the time frames Fabula alleged, these time frames defined the limits of Phase I discovery with respect to JC and WP.

## B.  Rule 56(d) Requirements

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." To obtain relief under Rule 56(d), a party must "submit[] an affidavit that includes the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Whelehan v. Bank of America Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 621 Fed. App'x 70, 73 (2d Cir. 2015).

## C. Discussion

Fabula makes two sets of arguments in his motion. First, he argues that AMR has failed to produce all discovery it should have produced in Phase I. Second, he argues that Phase I was too narrowly construed by the court or that it did not provide an adequate record for summary judgment. I reject both arguments.

Fabula's Rule 56(d) Motion is accompanied by his counsel's declaration, which lists six specific areas of discovery he allegedly needs to respond to AMR's motion for summary judgment:

> (a) All revised or amended PCRs . . . during 2010 and 2011, and the billing and payment records for these ambulance runs.
> (b) All PCRs for runs on which Relator was a crew member . . . and the billing and payment records for these ambulance runs.
> (c) The 'medical necessity' reports . . . sent on a daily basis during 2010 and 2011 and all notes and emails provided to AMR caregivers instructing them to revise PCRs . . . .
> (d) All PCRs during 2010 and 2011 for patients WP and JC, and the billing and payment records for these ambulance runs.
> (e) All PCRs for 2011 . . . containing an entry that an ALS Assessment was performed, and the billing and payment records for these ambulance runs.
> (f) Documents and information showing the statistics relating to Government Payor billings . . . and information concerning the efforts at AMR to increase Government Payor billings . . . .

Rule 56(d) Mot., ECF No. 158 at 4–5.

Fabula's first argument is that AMR should have produced the six categories of documents during Phase I, based on Fabula's own definition of the "Subject Transports." In his first set of discovery requests, Fabula defined "Subject Transports" as including, *inter alia*, "any AMR Ambulance Transports of [patient JC], as referenced in paragraphs 100 and 108 of the Third Amended Complaint" and "any AMR Ambulance Transports of [patient WP] in 2010 and 2011, as referenced in paragraph 109 of the Third Amended Complaint." Relator's Suppl. Definition, ECF No. 168-1 at 2–3. To the extent Fabula's own definition of the "Subject

Transports" differs from the Complaint Ambulance Runs, it is not an accurate description of the proper scope of Phase I discovery. *See* Telephonic Status Conference Tr., ECF No. 159 at 57, Sept. 5, 2018 (Fabula's counsel clarified that "the phrase subject transports is not used in the complaint, it's not used in the 2nd Circuit decision. That was a phrase that I made up in discovery to refer to a limited number of allegations in the complaint where there were things on runs."). Rather, the scope of Phase I is defined by my Scheduling Order, ECF No. 102 (limiting Phase I discovery to "the specific claims and ambulance runs identified in the operative Complaint"), and my Discovery Ruling, ECF No. 138 at 6 (defining "Subject Transports" as "the specific ambulance runs . . . alleged in the complaint"). As noted, that definition is based on the Second Circuit's ruling, and the six requests go far beyond the proper scope of Phase I discovery, requesting information not just on the Complaint Ambulance Runs, but on practically all PCRs and associated billing information over a two-year period.[23]

Fabula also argues that Phase I was too narrow to provide an adequate record for summary judgment, particularly on the issue of scienter. He argues that the six specific requests are "directly relevant to, and can substantiate, relator's assertions that AMR instructed its ambulance personnel, including relator to falsify its billings records . . . and to upcharge Medicare," and notes that his requests for such discovery were denied by the Court's September 12, 2018 order. Golub Decl., ECF No. 159 ¶¶ 9–10, 12 (citing Order, ECF No. 138). These allegations fulfill three of the four requirements under Rule 56(d), stating the nature of the

_____

[23] As noted above, to the extent Fabula argues that AMR performed an incomplete search for PCRs related to the Complaint Ambulance Runs or that it is withholding such PCRs, *see* Fabula Decl., ECF No. 153 ¶¶ 47, 50–53; Reply to Rule 56(d) Mot., ECF No. 176 at 3–7, he offers no evidence that there are additional PCRs within the time frames specifically alleged in the complaint. Nothing prevented Fabula from developing such evidence in Phase I discovery; he could have, for example, deposed the person responsible for conducting the search. In any event, he failed to raise any such objection during the discovery period. *See* ECF No. 138.

uncompleted discovery, what efforts Fabula has made to obtain those facts, and why those efforts were unsuccessful. The declaration and Fabula's motion fall short, however, in explaining "how the facts sought are reasonably expected to create a genuine issue of material fact" *as to the Complaint Ambulance Runs.* Because Phase I of discovery was designed to test the specifically articulated allegations of false claims in the complaint—those that were sufficient to raise a "strong inference that specific false claims were submitted"—Fabula's Rule 56(d) motion must show that the discovery he seeks is "reasonably expected" to create genuine disputes of fact about whether "false claims were in fact submitted in that limited set of cases." *Chorches*, 865 F.3d at 86, 88 n.13.

Fabula fails to make such a showing. His assertions that the information he seeks will yield evidence to resist summary judgment with respect to the Complaint Ambulance Runs amount to speculation. For instance, Requests "a" and "c" seek *all* revised or amended PCRs, medical necessity reports, and handwritten notes delivered to AMR's crewmembers in 2010 through 2011 to "establish the company-wide 'pattern' of fraudulent billing conduct." Golub Decl., ECF No. 159 ¶¶ 9–10. As discussed above, however, the evidence produced during Phase I—including PCRs, PCSs, and billing records related to the Complaint Ambulance Runs—does not permit a reasonable factfinder to conclude that AMR directed its employees to revise or recreate PCRs to include false or misleading information. Of the 221 PCRs produced in Phase I, Fabula has not pointed to a single one that contains a factually false statement. Nor has he shown that it is reasonable to expect that additional PCRs will support his theory of false revisions when the 221 PCRs produced so far have not.

Request "b" seeks the PCRs for *all* runs on which Fabula was a crew member. Golub Decl., ECF No. 159 ¶ 9. Fabula argues that these additional PCRs will "substantiate [his] sworn

contentions" in his declaration that he was personally required "to amend approximately 100 PCRs," Fabula Decl., ECF No. 153 ¶ 29, and "give the lie to AMR's argument that the false billings were the result of innocent mistake." Golub Decl., ECF No. 159 ¶ 10. But Phase I discovery—the only discovery supported by specific allegations of false claims—has not borne out Fabula's general contention that he was required to amend 100 PCRs, sworn though it may be. As shown above, Fabula has not identified any PCR relating to the Complaint Ambulance Runs that he completed that includes an addendum or contains false information of the sort alleged in the complaint. Aside from the fact that he is apparently seeking PCRs that do not relate to the Complaint Ambulance Runs, Fabula offers no reason to believe that hunting for more PCRs for runs on which he was a crew member will support his theory of false amendments to PCRs.

The same reasoning applies to Request "d," which seeks "[a]ll PCRs for 2010 and 2011 for patients WP and JC, and the billing and payment records for these ambulance runs." *See* Golub Decl, ECF No. 159 ¶¶ 9–10.  As discussed above, the scope of Phase I discovery was limited to the transports of WP and JC that were specifically alleged in the Fourth Amended Complaint: the transports of JC in 2011, and the transports of WP in Summer 2011. The PCRs produced for these patients in those time frames did not support Fabula's theory of false amendments, nor has Fabula presented evidence sufficient to raise a genuine dispute of material fact regarding any of his new theories of FCA liability related to patient WP. Again, Fabula fails to show why it is reasonable to expect that additional PCRs relating to JC and WP will evidence a scheme that the 150 such PCRs already produced do not. To grant these requests would contravene the rationale for phased discovery and give Fabula license to conduct "discovery of unknown wrongs." *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989).

Request "f" seeks discovery "relating to Government Payor billings" and "concerning the efforts at AMR to increase Government Payor billings" Golub Decl., ECF No. 159 ¶ 9. Fabula provides little explanation of how this discovery is expected to create a genuine dispute of material fact, asserting only that "information concerning the overall Medicare billing data [will] confirm the supervisors' stated intention [to increase Medicare billing percentages at the New Haven facility]." *Id.* ¶ 10. To the extent he seeks this additional discovery to develop evidence of scienter, such facts are not "essential to justify [Fabula's] opposition" to summary judgment. Fed. R. Civ. P. 56(d). I granted summary judgment as to the theory of falsified PCRs because Fabula presented no evidence that any PCR submitted to Medicare was *actually* false, and as to the Complaint Ambulance Runs of patient WP because there was no genuine dispute of material fact regarding the theories of liability actually pled in the Fourth Amended Complaint. Neither of these decisions turned on the element of scienter, with a narrow exception: I did point out that there is an absence of evidence of scienter with respect to ambulance runs Fabula's expert considered to have been improperly billed as "bed confined". In any event, Fabula fails to show that it is reasonable to expect that the discovery sought in Request "f" would create a genuine dispute of material fact as to scienter. Statistics relating to Government payor billings and the efforts at AMR to increase those billings might show that AMR improved its reimbursement rate, but Fabula can only speculate whether such evidence would permit a reasonable inference of knowingly false billing.

Request "e" seeks PCRs from January through October 2011 "containing an entry that an ALS Assessment was performed, and the billing and payment records for these ambulance runs." Because I denied AMR's motion for summary judgment with respect to Fabula's claims of intentional upcoding to bill for ALS assessments, this request is not "essential to justify [his]

opposition" and therefore not material to his Rule 56(d) motion. Similarly, Fabula's Reply to his Rule 56(d) motion addresses alleged deficiencies in AMR's production related to the October 17, 2011 transport. Because I denied summary judgment with respect to that transport, I need not address Fabula's concerns in the context of his Rule 56(d) motion.

Because Fabula did not show that any uncompleted discovery is essential to oppose summary judgment regarding the Complaint Ambulance Run, his Rule 56(d) motion is denied.

## VII. Motion to Exclude Report and Testimony of Edward T. Dickinson

AMR has also moved to exclude the testimony and report of Fabula's expert, Edward T. Dickinson. *Daubert* Mot., ECF No. 143. For the purposes of his report, Dr. Dickinson reviewed documentation relating only to transports of patient WP, Dickinson Decl., ECF No. 155 at 1, and his report addresses the "completeness and medical documentation" as well as the "appropriateness" of AMR's claims to Medicare for patient WP only, Dickinson Expert Report, ECF No. 155 at 6. He concluded that 34 of 78 PCRs related to patient WP had "documentation deficiencies," such as lacking patient vital signs, lacking a physical examination, or both. *Id.* at 6–7. Based on these documentation deficiencies, Dr. Dickinson opines that AMR "failed to meet the standard of care for [WP]" and that it is "inappropriate to submit an invoice to Medicare for payment at the BLS level (or higher) when the PCR fails to document vital signs and/or any physical examination." *Id.* at 9.

Dr. Dickinson's report and testimony are limited to patient WP and the theory of false claims based on inadequate documentation of vital signs or physical examinations. As shown, Fabula did not allege those theories in his Fourth Amended Complaint, and I have not relied on the report or testimony of Dr. Dickinson. Therefore, AMR's motion to exclude his report and testimony is denied as moot.

## VIII.   Conclusion

For the foregoing reasons, AMR's motion for summary judgment is DENIED as to the October 17, 2011 transport, DENIED as to the theory that AMR submitted false claims for ALS Assessments or ALS-level services, and DENIED as to Fabula's retaliation claim. For all other theories of liability asserted in the Fourth Amended Complaint, summary judgment is GRANTED.

Fabula's Rule 56(d) Motion is DENIED. AMR's motion to exclude the report and testimony of Edward T. Dickinson is DENIED as moot.

Because the motion for summary judgment following Phase I discovery is denied in part, the parties may seek additional discovery on the remaining claims. The Court orders the parties to file a revised Rule 26(f) Report within 14 days of this Order to identify appropriate topics for further discovery, to propose a reasonably abbreviated period to complete any such discovery, and to propose a schedule for trial.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        September 16, 2019